IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


J&M INDUSTRIES, INC.,

       Plaintiff/Counterclaim Defendant,

v.                                             Case No. 16-2723-JWB

RAVEN INDUSTRIES, INC.,

       Defendant/Counterclaimant.


**MEMORANDUM AND ORDER**

This matter is before the court on the following motions and briefs: Plaintiff's motion for summary judgment (Docs. 238, 239, 277, 295); Plaintiff's motion to exclude opinions of Dr. Carol Jones regarding non-infringement (Docs. 240, 241, 269, 287); Plaintiff's motion to exclude opinions of Dr. Carol Jones regarding invalidity (Docs. 242, 243, 272, 286); Plaintiff's motion to exclude opinions of Michael Lewis regarding damages (Docs. 244, 245, 270, 288); Plaintiff's motion to dismiss counterclaim (Docs. 246, 247, 275, 294); Defendant's motion to exclude opinions of Jeffrey Decker (Docs. 249, 250, 265, 290); Defendant's motion to exclude opinions of Antoinette Tease (Docs. 251, 252, 266, 289); and Defendant's motion for summary judgment (Docs. 253, 254, 292, 296). For the reasons stated herein, Plaintiff's motion to dismiss counterclaim (Doc. 246) and Defendant's motions to exclude opinions (Docs. 249, 252) are DENIED; the remaining motions are GRANTED IN PART and DENIED IN PART as stated in this order.

## I. Background

Plaintiff is a Louisiana corporation that designs and manufactures storage covers for the temporary storage of grains such as wheat and corn.  Defendant is a South Dakota corporation whose business includes the sale of storage covers for temporary grain storage systems.  (Doc. 1 at 2-3; Doc. 12.)

On May 24, 2016, the U.S. Patent and Trademark Office ("PTO") issued U.S. Patent No. 9,347,239 ("the '239 Patent"), which claimed a storage system for covering a pile of bulk material such as grain.  The '239 Patent disclosed an invention for using tarpaulins with an internal strapping system.  Plaintiff, the owner of the '239 Patent, filed this action on October 21, 2016, alleging that Defendant indirectly infringed the '239 Patent by making, offering, or selling Defendant's "Fortress Internal Strap System" to users who incorporated Defendant's product in their grain storage systems.  (Doc. 1 at 2-3.)

The court held a *Markman* hearing on May 29, 2018, and subsequently construed several terms in the '239 Patent.  (Doc. 147.)  On August 17, 2018, Plaintiff amended the complaint to add a claim that Defendant contributorily infringed a related patent, U.S. Patent No. 9,890,550 ("the '550 Patent"), owned by Plaintiff and issued by the PTO on February 13, 2018.  (Doc. 156 at 5.) Like the '239 Patent, the '550 Patent claimed a storage system for covering a pile of bulk material. At the time of the amendment, Plaintiff effectively conceded that under the court's construction of the '239 Patent claim terms, Plaintiff could not prevail on its claim for infringement of the '239 Patent. (*See* Docs. 153, 154.)  The '550 Patent relies on the same figures and description as the '239 Patent.  The only difference between the two is that the claims in the '550 Patent are broader than the claims in the '239 Patent.  (*See* Doc. 239 at 1.)  The '550 Patent is a continuation patent;

it claims a priority date based on the '239 Patent and a provisional application filed February 3, 2012.[1]  (*Id.*)

As set forth in the Pretrial Order, Plaintiff's only remaining claim is that Defendant contributorily infringed claims 8, 9, and 11 of the '550 Patent.  (Doc. 237 at 10.)  Plaintiff seeks damages and injunctive relief, and further contends the case is exceptional and the infringement is willful such that Plaintiff is entitled to increased damages and attorney fees and costs.  (*Id.* at 11.) Defendant denies the claim and asserts affirmative defenses.  Defendant also asserts a counterclaim for inequitable conduct, which alleges that Plaintiff obtained the '239 Patent by withholding material information about the prior art from the PTO during the prosecution of that patent, and that this conduct renders invalid or unenforceable the '239 Patent and "its entire family," including the '550 Patent. (*Id.* at 16.)

Claims 8, 9, and 11 of the '550 Patent, all of which are dependent on Claim 1, claim an invention comprising the following:

---

[1] The '550 Patent was issued from a continuation application that was in turn a continuation of one or more prior applications related to the '239 Patent.  (Doc. 156 at 5.)  "To qualify as a continuation application and claim the benefits of the earlier 'parent' application's priority date, the application must be made while the parent is still pending …, expressly refer to the parent application, identify at least one common inventor, and encompass the same disclosure of the parent application without adding any new matter."  *Patent Case Mgmt. Judicial Guide,* § 14.2.3.3 (Fed. Jud. Ctr. 3d ed. 2016) (citing 35 U.S.C. § 120).  A provisional application must similarly meet certain requirements and may provide the benefit of an earlier priority date.  *See* 35 U.S.C. § 119(e).

**1**. A storage system for covering a pile of bulk material, the system comprising:

a storage area surface having a storage perimeter defined at a ground surface within which the pile of bulk material is deposited;

a retaining wall extending along the storage perimeter;

a tarpaulin including:

at least one perimeter edge defining at least a portion of a tarpaulin perimeter, a portion of the at least one perimeter edge extending over at least a portion of the retaining wall;

at least one tunnel integrally bonded to the tarpaulin; and

a strap provided within the tunnel, at least one end of the strap extendable beyond at least a portion of the retaining wall; and

a board wherein the board is secured to the retaining wall so that a portion of the tarpaulin is located between the board and the retaining wall.

**8**. The storage system of claim **1**, further comprising a tightening mechanism connected to the at least one end of the strap.

**9**. The storage system of claim **8**, wherein the tightening mechanism comprises a winch.

**11**. The storage system of claim **1**, wherein the strap is freely movable through the tunnel.

Doc. 156-5 at 18.

## II.  Uncontroverted facts.[2]

The PTO issued the '239 Patent to Plaintiff on May 24, 2016.  On October 21, 2016, Plaintiff brought the instant suit against Defendant for indirect infringement of the '239 Patent. On February 13, 2018, the PTO issued the '550 Patent to Plaintiff.  The '550 Patent claims priority to the '239 Patent and Provisional App. No. 61/594,727 filed on February 3, 2012. (Doc. 239 at 1.)  The claims of the '239 and '550 Patents are directed to an internal strapping system for

---

[2] The parties' cross-motions for summary judgment are discussed later in this opinion, following rulings by the court on motions relating to expert testimony and other matters.  The court first sets forth the uncontroverted facts relating to summary judgment because they are helpful to an understanding of the other motions.

covering a pile of bulk material.  The claims are not limited to the tarp portion of the system but include other components as well.  The '550 Patent relies upon the same figures and description as the '239 Patent.  The only difference is the scope of the claims.  (*Id.*)

On August 17, 2018, Plaintiff filed its first amended complaint adding the '550 Patent to the instant litigation.  Plaintiff dismissed with prejudice its infringement claims as to the '239 Patent, leaving the '550 Patent as the only patent still at issue. Plaintiff alleges infringement of Claims 8, 9, and 11 in this litigation.  (*Id.* at 1-2.)

On August 18, 2017, Plaintiff filed an Information Disclosure Statement ("IDS") with the PTO that contained Defendant's invalidity contentions. Defendant's initial invalidity contentions included the "Union Iron System," the "Western Ag hay tarps," and the "Quadrant System" (identified as the "Raven Covers"). (*Id.* at 2.)   Plaintiff also submitted the Bates numbered documents identified by Defendant with its invalidity contentions.  The documents identified as "RavenJMI0000522-580" submitted to the PTO reflected "Western Ag Hay Tarps," although Defendant contends it learned during a deposition on January 30, 2019, that these documents were not actually Western Ag drawings.  (Doc. 239 at 2; Doc. 277 at 5.) The initial invalidity contentions and related documents were considered by the Patent Examiner in the '550 Patent prosecution. (*Id.* at 3.) Defendant cites evidence that the Patent Examiner considered the invalidity contentions and materials after Plaintiff and the Examiner had reached an agreement concerning - according to Defendant - the patentability of the claims in the '550 Patent.  (Doc. 277 at 5-6.)  Plaintiff contends the agreement concerned only one rejection, not the patentability of the claims generally.  (Doc. 295 at 2-3.)  Among other things, Plaintiff argues the Examiner would have issued a notice of allowance (NOA) had there been agreement on patentability.  (*Id.* at 3.) The court concludes there is a genuine issue of fact as to the scope of agreement between the Examiner and Plaintiff.  After

the '550 Patent was added to the instant suit, Defendant served amended invalidity contentions that address the '550 Patent.

Defendant's expert, Dr. Jones, opined that the '550 Patent is invalid due to the "on-sale bar" of 35 U.S.C. § 102. A patent is invalid under the on-sale bar if, more than one year before the application filing date, the invention was the subject of a commercial sale or offer for sale and was ready for patenting. *GS Cleantech Corp. v. Adkins Energy LLC*, 951 F.3d 1310, 1324 (Fed. Cir. 2020) (citing *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998)). Among other things, Dr. Jones said it was "possible" Plaintiff offered its internal strapping system for sale to Archer Daniels Midland ("ADM") prior to February 1, 2012, and she cited an "indication" that a verbal offer for sale occurred in a conversation between James Ramsey of ADM and Aaron Gummer of Plaintiff sometime between October 2011 and February 2012. (Doc. 239 at 3.) Defendant cites evidence that Ramsey and Gummer had a conversation in which Gummer discussed Plaintiff's new internal strapping system. (Doc. 277-24 at 5-6.) Gummer said he wanted to meet with Ramsey about it. He explained they would ratchet down the internal strap in the tarp to the walls. (*Id.* at 6.) Ramsey's recollection of when this occurred was hazy, but thinks it may have been around December 6, 2011. (*Id.* at 5.) On December 6, 2011, Gummer sent Ramsey an email stating that Plaintiff would replace, at no charge, some tower skirt covers that had ripped at an ADM facility and would get back to Ramsey "on pricing once it comes out for both the tarps and the new strapping system." (*Id.*) On January 30, 2012, Gummer sent an email to another ADM representative, introducing himself and soliciting ADM's business. The email pointed out that Plaintiff's products included "a line of strapping systems to help hold the covers down," and said Gummer would be in Toledo that Friday and could stop in to discuss "some of [Plaintiff's] advantages, and new designs." (Doc. 260-5.) The email contained no pricing information or

specific product identification. At the time, Plaintiff's product line included external strap covers. Gummer sent an ADM representative an invoice, dated February 6, 2012, offering to deliver internal strapping system tarps for a specified price. (Doc. 260-3.)  On February 8, 2012, Gummer emailed Ramsey a document showing current pricing on internal strapping system tarps for ADM. (Doc. 260-4 at 1.)

The parties cite evidence relating to four categories or types of prior art, which they refer to as follows:  (1) the Raven Quadrant Systems, (2) the Integra Powerfill quote, (3) Western Ag tarps, and (4) the Union Iron system.  The evidence pertains to Defendant's contentions that the prior art anticipates the '550 Patent or otherwise invalidates it.

1. *Raven Quadrant Systems*.  The Quadrant Systems have cables that lift a cover up and outwardly while grain is poured through a center hold in the tarp.  Defendant cites various references, including photographs and testimony of Ralph Soles, indicating that one or more "cable pocket" or Quadrant Systems was installed with a wall, a board, a tarp secured between the wall and the board, and ratchets to tighten movable straps embedded in the tarps.  (Doc. 277 at 6-8; Doc. 260-6.)  Plaintiff's reply (Doc. 295 at 4) argues in part that some of the pages cited by Defendant were not cited by Dr. Jones, but that fact alone does not render the evidence cited inadmissible. Plaintiff also argues that some of the drawings relate to systems made after the date of the '550 Patent, but Plaintiff fails to cite specific evidence showing beyond reasonable dispute that any and all of the apparently infringing systems portrayed in the cited materials post-date the '550 Patent effective date.  Plaintiff also argues that none of the documentary items cited disclose all of the elements of the '550 Patent.  (Doc. 295 at 4.)  But just as Plaintiff can rely on circumstantial evidence to show that Defendant's systems were installed in an infringing manner, Defendant can rely on circumstantial evidence to show they were installed in an infringing manner

prior to the critical date of the '550 Patent. A reasonable jury considering all of the evidence, and drawing all inferences in favor of Defendant, could find that a Quadrant Systems cover was installed in an allegedly infringing manner prior to the critical date. On the other hand, a reasonable jury drawing all inferences in favor of Plaintiff could find the evidence fails to show a prior art reference containing all the elements of Claims 8, 9, or 11 of the '550 Patent.

2. *Integra Powerfill quote and related sales.*  Robert Hesse worked for Integra Plastics, Inc., a competitor of Plaintiff's, from 1991 to 2014. He designed grain covers. Defendant acquired Integra in November 2014. (Doc. 254 at 6.)

A rain flap is a feature used to cover a seam where two sections of a grain tarp are joined together, in order to keep moisture out.  The rain flap, located on top of the seam, joins together with Velco and forms a pocket or void above the seam in the tarp.  (*Id.* at 6-7.)

Hesse recommended to customers before 2009 that they place cables or webbing straps in the pockets formed by the rain flaps of their center-fill, multiple-piece round grain storage systems. He recommended they attach one end of a cable to a lift ring on the center tower to prevent the wind from shifting a grain cover while a pile is being filled.  The other end of the cable would go over the wall or between cracks in the wall and would have been anchored down at the perimeter base with a tightening mechanism that would let more cable out as the lift ring was raised.  (Doc. 254-8 at 10-16.)

Hesse was aware of a configuration with cable pockets that Defendant (Raven) sold to Cargill at its Blue Earth, Minnesota, facility in 2008 that had cables attached in the foregoing manner.  (*Id.* at 15-17.)  Cargill wanted to use Integra's rain flap system with cables but wanted Raven's tarp material instead of Integra's, so Cargill asked Raven if it could install cable pockets

on tarps.  Cargill bought tarps from Defendant with cable pockets for its facilities at Blue Earth, Pipestone and Gibson City.  (Doc. 254 at 8.)

Raven sold a round, four-piece tarp with "rope pockets" or "cable pockets" in 2008.  The grain cover consisted of four pieces, each with a pocket attached to the leading edge with a rope in each pocket.  The rope was freely movable so a customer could use the rope to pull a cable through the pocket.  (*Id.* at 8.)  The tarp was attached to walls using batten and nailing strips.  The four cables were then secured to the lift ring on one end and to a winch attached to the bunker wall or ground on the other end to anchor down the cable at the bottom of the outside perimeter base to the ground or wall.  (*Id.*)

In 2009, Hesse designed a hoop building cover with Danny Cameron from Powerfill, a Canadian company.  Powerfill wanted a hoop building cover with pockets that extended over the top of the cover with a webbing strap inserted in the pockets so the straps would extend over the edges of the building walls and be fastened down to a ratchet or anchoring device.  (Doc. 277 at 13.) The Powerfill quote supplied by Integra in April 2009 comprised a tarp, with straps embedded in pockets, and ratchets.  (Doc. 239 at 6.)  The quote and/or drawing did not describe a "wall" but disclosed a "Hoop Building."  At the time of his deposition, Hesse could not specifically remember but assumes the hoop building had walls. (Doc. 239-13 at 3.) Integra offered to design and build the cover for a specific price but Powerfill declined. The Powerfill cover was never actually ordered, manufactured, or used.  (Doc. 277 at 13.)

Hesse also designed a grain tarp with embedded straps in parallel pockets that Integra sold to ADM at Copeland, Kansas, in 2013.  Hesse testified the tarp was the same design concept as the Integra tarp offered in the Powerfill quote.  (Doc. 254 at 10.) In a March 4, 2019, interrogatory response, Plaintiff accused the foregoing sale to ADM – and every sale of "Raven's internal strap

system" – of resultant infringement of the '239 or the '550 Patent. (Doc. 254-9 at 2.)  Plaintiff now states, however, that because it subsequently dismissed its infringement claims as to the '239 Patent, it no longer asserts that any sales, offers, or uses prior to issuance of the '550 Patent infringe.  (Doc. 292 at 9.)

3. *Western Ag tarps*.  Western Ag is a competitor of both Plaintiff and Defendant that sells tarps.  Western Ag makes tarps for covering commodities such as sugar beets, corn, grain, and hay. (Doc. 254 at 4.) Plaintiff sets forth a number of facts allegedly distinguishing between Western Ag's "hay tarps" and its "grain tarps."  (Doc. 239 at 7-8.)  Defendant cites evidence, however, that Western Ag used its hay tarps to cover grain and that there was no distinction between the two. (*See* Doc. 254-2 at 26-29, 31) (testimony of Western Ag President Richard Carter.)

Since 1988, Western Ag has made tarps that have included a strap sewn in a pocket on the ends of its tarps with a tie down, like on the end of a Conestoga covered wagon.  (Doc. 254 at 4.) Since 1999 or so, Western Ag has been selling hay tarps with freely movable straps inside pockets. It hired a company from Ohio to manufacture a machine to weld pockets onto tarps that could hold freely movable straps. (*Id.*)  Western Ag still uses the machine.  The straps on Western Ag's tarps were commonly tied down tight to a bale string, twine, or a strap that comes out from the bottom of the hay stack.  Every now and then since at least 2010, and perhaps back as far as 1999, Western Ag has used a winch to tighten straps for test purposes or in high winds and if stacks are high and wide. (Doc. 254 at 5.)  Western Ag has advertised its tarps with straps over the years.  One ad it ran in about 2005 showed a hay tarp with straps inside pockets.  (*Id.*)

Western Ag has sold hay tarps with parallel, freely movable straps in pockets to customers for covering grain since before 2010.  (Doc. 254 at 5.)  Grain tarps and hay tarps have the same basic function: to keep the elements away from stored material. Richard Carter of Western Ag

testified that all the Western Ag covers he had seen used for grain storage had hay bales around the perimeter for a retaining wall, with grain filling the space between the walls, and with straps from the tarps attached to the hay bale retaining wall.  (Doc. 254-2 at 29-33.)  The straps were tied to a strap coming out from underneath the hay or to twine on the hay using a half-hitch to cinch it down.  (Doc. 254 at 6.)  The parties cite conflicting opinions on whether a half-hitch is a "tightening mechanism." Richard Carter of Western Ag says it is; Donald Gaudet of Plaintiff says it is not.  (Doc. 254-2 at 37; Doc. 292-25.)

Defendant has produced a Western Ag work order for a "100' x 130' grain pile cover" with "pull straps every 4'."  Carter's affidavit states this was an example of a 2010 Western Ag sale of a tarp with pockets containing freely movable straps that was used to cover a grain pile. (Doc. 239-16.) Neither the work order nor any of the other Western Ag documents disclosed Western Ag tarps used with a board to secure the tarp to the retaining wall.

Jeffrey Decker, Plaintiff's technical expert, testified that a person skilled in the art would understand how to secure the tarp described in Plaintiff's provisional application to the retaining wall using a board.  He opined that Plaintiff was entitled to the priority date of its provisional patent application, (Doc. 254-7 at 4-6.)  He noted that Dr. Jones said it was known at the time of Plaintiff's invention to secure a tarp to a wall with a board, and Decker said it follows from this "that a person skilled in the art would understand how to secure the tarp described in the provision application to the retaining wall using a board."  (*Id.* at 5.)

4. *Union Iron System*.  Defendant's invalidity contentions allege that the Union Iron System anticipates the '550 Patent.  Defendant admits that the Union Iron System does not include "integrally bonded pockets … through which straps are placed."  (Doc. 239 at 9.) Defendant alleges that a person of ordinary skill in the art ("POSITA") "could have inherently combined his-her own

11

knowledge of tarpaulin covers (i.e., use of tunnel/pockets for straps) with the Union Iron System."
(*Id.*)

    <u>Inequitable conduct counterclaim</u>.   Defendant cites evidence that Aaron Gummer, an employee of Plaintiff and co-inventor on the '239 and '550 Patents, knew before he sought a patent that Western Ag sold hay tarps that had freely movable, internal straps.  Gummer was long-time friends with Justin Young, who worked for Western Ag, then for Plaintiff, and then for a Western Ag distributor ("Tarp-It".) (Doc. 254 at 12.) In about 2003, Gummer visited Young in Washington and saw Western Ag hay tarps with pockets that extended from one side of the tarp to the other with a freely movable strap or webbing in the pockets. (Doc. 255-11 at 21-23.)   Gummer later discussed with his co-inventor Donald Gaudet, Jr., whether the Western Ag prior art would pose a "conflict" to Plaintiff's ability to get a patent. According to Gummer, he and Gaudet concluded there was no conflict because they were creating "a complete system for the grain business that consists of more than just the webbing and a pocket."[3]  (*Id.* at 24.)  Plaintiff did not disclose the Western Ag prior art to the PTO during its prosecution of the '239 Patent.  (Doc. 237 at 8-9.)  Gummer testified he "told the [patent] attorneys about it."  (Doc. 239-8 at 6.)  Defendant alleges this failure to disclose was done with intent to deceive the PTO, and that had it been disclosed the PTO would have rejected the '239 Patent claims, meaning there would have been no continuation patents like the '550 Patent. (Doc. 237 at 8-9.)

    Plaintiff stated in its provisional patent application: "[w]hile the subject matter disclosed herein was designed for bulk grain piles, the system for storing commodities may be used for any bulk storage of commodities," and "[o]ptionally, the system for storage may be used in any other

---

[3] Gummer said, "we went back and forth with each other" as to whether "what we are creating [is] different and novel in the fact that it's – it's different than what Western Ag already has, and we believed so."  (Doc. 255-11 at 25.)  He acknowledged being concerned "[b]ecause one element of … our design had something very similar to what Western Ag had, and that was the … pocket with the strap in it." (*Id.* at 25-26.)

scenario where a tarpaulin with weather resistant material may be used." (Doc. 254-12 at 538-39.) The '550 Patent is a continuation of the '239 Patent. (Doc. 254 at 13.) The '550 Patent specification discloses that: "the system for storage may be used to store salt, compost, silage, contaminated soil and the like"; "the storage system may be used for storage tank covers such as water tanks"; that a preferred embodiment of the storage system is used with a ground surface surrounded by a retaining wall but also discloses embodiments where it is used without a wall in which case "the tarpaulin may be secured to anchors embedded in the ground." (*Id.* at 15.) Defendant advertises that its Fortress internal strap system includes two ratchets that can be mounted to the containment wall or earth anchors to keep the cover held tightly to the grain pile. (*Id.*)

Defendant's employee Jeany Hesse testified that customer Consolidated Grain and Barge told her it wanted an internal strapping system to be used without walls. (*Id.*) Defendant's invoice from the request, dated August 14, 2017, indicates the system was to be "ground placed." (Doc. 259-14 at 1.) Defendant cites photographs that it contends shows this system was in fact attached to earth anchors without a retaining wall. (Doc. 259-15.) Hesse testified that customer North Central Co-Op also asked for an internal strapping system and said they would be using it without walls. She said several other customers made similar requests, although she could not remember their names. (Doc. 254 at 15.) Hesse testified she would indicate "special straps" on quotes when she knew a customer was going to use the system without a wall, to signify straps that would be attached to augers or anchors instead of a wall. (*Id.* at 16.) Defendant cites a November 15, 2015, sales order indicating Defendant sold two Fortress grain covers to Texhoma Wheat Growers in Texas with "special straps with ratchets" to "attach to earth anchors." (Doc. 259-16.) Defendant cites a sales quote dated September 2017 indicating it offered multiple grain covers to Scoular

13

Company in Nebraska with "Special strap for earth augors [sic]." (Doc. 259-18.)  It cites evidence that it sold "ground placed" internal strap Grainmax grain covers to Scoular in October 2017 and August 2018. (Docs. 259-19, 259-20.)  Defendant cites a purchase order dated October 24, 2016, showing Union Iron ordered tarp covers from Defendant with integrated "Strap/Ratchets" and "Special Straps/No walls." (Doc. 259-21.)  Defendant cites invoices dated August 2017 indicating it sold Protector covers with integrated straps, including "[ratchet] with strap attached" for "ground placement." (Doc. 259-24.)

Jeany Hesse testified Defendant has sold internal strapping systems for use in covering salt piles without walls. (Doc. 254 at 17.)  Dr. Jones opined that salt piles typically do not have walls, as salt will corrode a wall. (*Id.*)  Defendant cites an August 25, 2018, invoice showing it sold a Grainmax integrated strap cover to Progressive Rail Today in Minnesota, including ratchets with straps attached, for use as a "Salt Pile Cover." (Doc. 259-26.)

Plaintiff has sold internal strapping systems for use without walls in emergency situations. Aaron Gummer estimated that Plaintiff sells 50 to 100 tarps per year to cover emergency piles. (Doc. 254 at 17.)

**III.  Plaintiff's motion to dismiss counterclaim.  (Docs. 246, 247, 275, 294.)**

The court will address this motion first because it deals with subject matter jurisdiction. (Doc. 247 at 2.)  Plaintiff argues there is no case or controversy – and hence no jurisdiction – with respect to Defendant's counterclaim for inequitable conduct relating to prosecution of the '239 Patent because Plaintiff has agreed to dismiss with prejudice its infringement claim concerning the '239 Patent and has provided Defendant a covenant not to sue on that patent. (*Id.* at 3-4.)

"A case becomes moot – and therefore no longer a 'Case' or 'Controversy' for purposes of Article III – when the issues presented are no longer 'live' or the parties lack a legally cognizable

interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).  Under this standard, the court rejects the argument that there is no case or controversy with respect to the counterclaim. The counterclaim alleges in part:

> As a result of [Plaintiff's] inequitable conduct …, [Plaintiff's] *patents* are not enforceable.  Because the '239 patent is in the same family as the '550 patent, if there is a finding of inequitable conduct in the prosecution of one of the patents, the other patent is also unenforceable due to inequitable conduct.

(Doc. 237 at 16) (italics added).  These allegations make clear that the counterclaim includes a challenge to the enforceability of the '550 Patent.  Thus, the counterclaim involves an ongoing dispute on a matter in which the parties have legally cognizable interests.  Plaintiff's motion to dismiss the counterclaim for lack of subject matter jurisdiction is therefore denied.

### IV.  Motions to exclude expert opinions

A.  <u>Rule 702 and *Daubert* standards</u>.  Federal Rule of Evidence 702, which controls the admission of expert witness testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Under this rule, the district court must satisfy itself that the testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony.  *Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1282 (10th Cir. 2018) (citing *United*

*States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc)).[4]  The district court must first

determine whether the witness is qualified by knowledge, skill, training, experience, or education

to render an opinion.  *Id.*  If so, the district court must determine whether the witness's opinion is

reliable by assessing the underlying reasoning and methodology.  *Id.* at 1283.  The court is not

required to admit opinion evidence that is "connected to existing data only by the *ipse dixit* of the

expert," and may exclude the opinion if "there is simply too great an analytical gap between the

data and the opinion offered."  *Id.* (quoting *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997)).

But the rejection of expert testimony is the exception rather than the rule, and "[v]igorous cross-

examination, presentation of contrary evidence, and careful instruction on the burden of proof are

the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert v.*

*Merrell Dow Pharm., Inc.* 509 U.S. 579, 596 (1993).

"The court has discretion to determine how to perform its gatekeeping function under

*Daubert.*"  *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*,

No. 17-MD-2785-DDC-TJJ, 2020 WL 1164869, at *3 (D. Kan. Mar. 10, 2020) (citing *Bill Barrett*

*Corp. v. YMC Royalty Co.*, LP, 918 F.3d 760, 770 (10th Cir. 2019)).  The most common method

of fulfilling that role is by conducting a *Daubert* hearing, "although such a process is not

specifically mandated."  *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th

Cir. 2000).  In this instance, neither party has requested a *Daubert* hearing.  Moreover, the nature

of the opinions expressed, the relative completeness of the expert reports, and the materials cited

in support of and against the challenged opinions lead the court to conclude that the motions can

---

[4] As Judge Lungstrum pointed out in *Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns LLC*, 225 F. Supp.3d 1233, 1239, n.2 (D. Kan. 2016): "The law of the regional circuit—in this case, the Tenth Circuit—governs procedural issues not unique to patent law. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390–91 (Fed. Cir. 2003). Thus, the Court applies Tenth Circuit law concerning the admissibility of expert testimony. The Court applies Federal Circuit law concerning substantive matters unique to patent law. *See Revision Military, Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 525 (Fed. Cir. 2012)."

be decided without a *Daubert* hearing. *Ho v. Michelin N. Am., Inc*., 520 F. App'x 658, 664 (10th Cir. 2013) (district court permissibly exercised its discretion in ruling without a formal *Daubert* hearing). Should additional *Daubert* issues arise at trial that require further inquiry, the court will determine at that time how to handle them. *Cf. Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 772 (10th Cir. 2019) ("a judge does not abuse his discretion by conducting a *Daubert* hearing in the presence of the jury through direct examination and voir dire.") (citing *Goebel*, 215 F.3d at 1087).

B.  <u>Dr. Carol Jones – Opinions on Non-infringement</u>. (Docs. 240, 241, 269, 287.)

i.  *Testimony concerning the '239 Patent*.  Plaintiff argues any such testimony or opinions will not help the trier of fact because Plaintiff has abandoned its claim for infringement of the '239 Patent, making any testimony about that patent irrelevant.  (Doc. 241 at 4.)  Rule 401 of the Federal Rules of Evidence provides that evidence is relevant if it has "any tendency to make a factor more or less probable than it would be without the evidence" and the fact is of consequence in determining the action.  Under this standard, the court rejects the motion to exclude any and all testimony by Dr. Jones about the '239 Patent or its prosecution history.  It is undisputed that the '550 Patent is a continuation of the '239 Patent. (*See* Doc. 254 at 13.) Defendant's counterclaim alleges that inequitable conduct in the prosecution of the '239 Patent renders the '550 Patent unenforceable.  Case law provides that "inequitable conduct with respect to one or more patents in a family can infect related applications…."  *Digital Ally, Inc. v. TASER Int'l., Inc.*, 2018 WL 1152285, at *2 (D. Kan. Mar. 5, 2018) (quoting *Nilssen v. Osram Sylvania, Inc.*, 504 F.3d 1223, 1230 (Fed. Cir. 2007)). *See also Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1288 (Fed. Cir. 2011) ("the taint of a finding of inequitable conduct can spread from a single patent to render unenforceable other related patents and applications in the same technology family.")

(citation omitted.)  Testimony concerning inequitable conduct relating to the '239 Patent may therefore be relevant with respect to enforceability of the '550 Patent.[5]  The court denies the motion in that respect.

Plaintiff also argues Dr. Jones' opinions about *infringement* of the '239 Patent should be excluded because that patent is no longer an issue in the case.  (Doc. 241 at 5.)  Defendant's response fails to identify the relevance of any such opinions.  (Doc. 269 at 2.)  Rather, Defendant says it will show "the high relevance" of these opinions "at the time of trial if necessary," but argues this is not a proper *Daubert* challenge.  (*Id.* at 3.)  The court disagrees. The *Daubert* inquiry asks in part whether an expert's opinion will help the jury understand the evidence or determine a fact in issue -- a condition that "goes primarily to relevance." *Daubert,* 509 U.S. at 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Id.* As indicated previously, some opinions about the '239 Patent and its prosecution history may be relevant to show that inequitable conduct makes the '550 Patent unenforceable.  But Defendant has not pointed to specific matters showing the relevance of any expert opinions concerning *infringement* of the '239 Patent.  *United States v. Nacchio,* 555 F.3d 1234, 1241 (10th Cir. 2009) (the proponent of expert testimony bears the burden of showing its admissibility).  Accordingly, Dr. Jones' opinions as to whether Defendant infringed the '239 Patent will be excluded.

ii.  *Opinions concerning induced infringement*.  Plaintiff argues these opinions are not relevant because the only claim of induced infringement pertained to the '239 Patent and has now been dismissed. (Doc. 241 at 6.)  Defendant's response fails to show the relevance of any opinion

---

[5] Although there is case law holding that a defense of inequitable conduct is an equitable matter reserved for the court, a district court can submit the factual predicates for the defense to a jury.  *See Rothman v. Target Corp.*, 556 F.3d 1310, 1322-23 (Fed. Cir. 2009).  The Pretrial Order in the instant case states that this case "will be tried by jury." (Doc. 237 at 20.)

18

concerning induced infringement.  (Doc. 269 at 2-3.)  Because the trial does not include any claim for induced infringement, these opinions will be excluded as non-helpful to the jury.

iii.   *Opinions concerning substantial non-infringing use*.  Plaintiff argues Dr. Jones's opinions that there were substantial non-infringing uses for Defendant's accused products should be excluded because she "completely disregards the applicable legal standards and instead applies her own definition of 'substantial non-infringing uses.'"  (Doc. 241 at 6.)  The court rejects this argument for the reasons that follow.

"To establish liability for contributory infringement, a patent owner must show, *inter alia*, that there are no substantial [non-infringing] uses for the accused product." *Grunenthal GMBH v. Alkem Labs. Ltd.,* 919 F.3d 1333, 1340 (Fed. Cir. 2019) (citing 35 U.S.C. § 271(c)). "*Id.* (citations omitted.)  A non-infringing use is substantial when it is "not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *Id.*  Dr. Jones's report shows that she correctly cited the foregoing as the governing legal standard.  (Doc. 241-1 at 10.)  Plaintiff argues her opinion is unreliable, however, because elsewhere in her report and deposition, Dr. Jones allegedly applied a different standard.  This argument is not persuasive.  At one point in her report, Dr. Jones stated she understood "that a substantial [non-infringing] use, or whether the product has believable, meaningful purposes other than infringing uses, negates a claim for contributory infringement."  (Doc. 241-1 at 6.)  When asked about this statement at her deposition, Dr. Jones said that in describing the product uses as "believable and meaningful" she did not "see a lot of difference" between that and being "not unusual, far-fetched, illusory, impracticable, occasional, aberrant, or experimental." (Doc. 241-1 at 4.)  She explained that she used the former phrase because she "wanted to make sure we were not talking about experimental," or "something that's just been done occasionally or that out there that somebody might have dreamt of and never really

happened." (*Id.*)  Dr. Jones went on to identify allegedly non-infringing uses of Defendant's product "like covering water, covering a salt pile, [and] covering grain piles without using walls," and cited evidence of such actual uses.  (Doc. 241-1 at 11.)  Viewed in context, the record does not demonstrate that Dr. Jones's opinion was the product of an incorrect legal standard.  Although there is no "believable and meaningful" standard for substantial non-infringing uses, Dr. Jones's testimony shows she was paraphrasing and applying the legal standard cited elsewhere in her report.  Thus, she explained that usage could not be "experimental," could not merely be "done occasionally" [i.e. could not be unusual, occasional, or aberrant], could not be something that "somebody might have dreamt of" [i.e. could not be far-fetched, impracticable], and could not be something that "never really happened" [i.e. could not be impracticable or illusory.]  A rational finder of fact could find that Dr. Jones applied the correct standard in expressing her opinion on substantial non-infringing uses.  To the extent Plaintiff might be able to persuade a finder of fact to conclude otherwise, that is an issue for cross-examination at trial.  *Daubert,* 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.")

     iv.  *Opinions on direct infringement*.  Plaintiff argues Dr. Jones's opinions on direct infringement constitute improper legal opinions.  (Doc. 241 at 8-9.)  Plaintiff specifically objects to Jones's opinion that in determining whether there is direct infringement, "it is necessary to inspect each potential site to examine whether or not each and every claim limitation of any asserted claims are present," and "it is necessary to examine [a] specific location to see how the Raven product was installed…." (*Id.* at 8-9) (citing Doc. 241-1 at ¶¶ 27, 37.)  Plaintiff argues this

improperly tells the jury that only direct evidence -- and not circumstantial evidence -- can prove direct infringement.

Plaintiff's argument is unpersuasive. Nowhere does Dr. Jones purport to say that circumstantial evidence cannot lawfully be considered or that the law requires direct evidence for a finding of infringement. Her report conveys an opinion that circumstantial evidence is not sufficient to show infringement *under the circumstances of this case* because of the possibility of non-infringing uses for Defendant's product. Thus, she believes "[g]iven the nature of the claims of J&M's patents, it is not possible to determine, *without speculating*, whether a particular site directly infringes … without going to each site individually to examine how the system is installed …." (Doc. 241-1 at 7-8) (emphasis added.) That is a permissible position on whether an inference of direct infringement is reasonable under the circumstances, as opposed to a declaration of what evidence the law allows jurors to consider.

v. *Patent prosecution expertise.* Plaintiff argues Dr. Jones has no expertise that would allow her to opine regarding the prosecution history of either the '239 or '550 Patent. (Doc. 241 at 11-12.) Plaintiff specifically objects to Dr. Jones's opinion, based on her review of the file history, that Plaintiff tried to have its patent claims "cover this use (ground piles without walls), but the Patent Examiner did not allow it." (*Id.* at 11.)

The motion to exclude this testimony will be denied. Defendant cites evidence that Plaintiff's initial '239 Patent Application included a claimed system without walls. (Doc. 269 at 6-7.) It appears undisputed that this claim was rejected by the Patent Examiner, that Plaintiff later amended the claim to include a retaining wall, and that the claim was subsequently allowed with a retaining wall as part of the '239 Patent. Dr. Jones' recitation of this undisputed sequence of events is hardly an "opinion" at all, and her citation of it in support of her opinion on substantial

non-infringing uses does not make it a matter outside the scope of her expertise. Plaintiff has not shown the testimony should be excluded under Rule 702.

C. Dr. Carol Jones – Opinions on invalidity.  (Docs. 242, 243, 272, 286.)

i. *Testimony regarding the '239 Patent*.  Plaintiff argues that any opinions of Dr. Jones "regarding the '239 Patent, any alleged invalidity or unenforceability of the '239 Patent, the prosecution of the '239 Patent, or any alleged inequitable conduct relating to the '239 Patent are all irrelevant" to the issues remaining in the litigation.  (Doc. 243 at 3.)

For reasons stated previously, opinions relating to inequitable conduct by Plaintiff in procuring the '239 Patent – including Plaintiff's failure to disclose "Western Ag prior art" (Doc. 237 at 16) – could be relevant to Defendant's counterclaim.  The motion to exclude opinions on that matter as irrelevant is denied.  Otherwise, Plaintiff's motion to exclude Dr. Jones's opinions relating to invalidity of the '239 Patent is granted.  Defendant again argues it will show the relevance of these opinions "if necessary" at trial but, as explained previously, a showing of relevance is required at this point in assessing the admissibility of expert testimony under *Daubert* and Rule 702. *Siegel v. Blue Giant Equip. Corp.*, 793F. App'x 737, 740 (10th Cir. 2019) ("Rule 702 imposes 'a special obligation' on trial courts to act as gatekeepers to ensure expert testimony is relevant and reliable before admitting it.") Defendant's vague assertion that the prosecution history of the '239 Patent "affects the scope of claims for purposes of determining both non-infringement and invalidity of the related '550 [P]atent" fails to show the relevance of any particular opinion by Dr. Jones about invalidity of the '239 Patent.[6]

---

[6] Defendant also says Dr. Jones offered opinions about the '239 Patent because Plaintiff did not dismiss its claim for infringement of that patent until after expert discovery was closed.  (Doc. 272 at 3, n.2.) That explains why Dr. Jones included the opinions in her report, but it does not explain why the opinions are relevant to the issues to be decided by the jury.

ii. *Jones's lack of expertise in patent prosecution and procedures.*  Plaintiff contends Dr. Jones is not qualified to render opinions concerning patent office procedures or the intent of patent applicants or the examiner. (Doc. 243 at 1.) Defendant concedes that opinions about an examiner's intent are speculative, but argues Jones's opinions are proper because they relate to infringement and materiality, and as a person of skill in the art she is a qualified to offer such opinions. (Doc. 272 at 4-5.) Each side cites *Meds. Co. v. Mylan Inc.*, No. 11-cv-1285, 2014 WL 1257957 (N.D. Ill. Mar. 27, 2014) in support of its position.

Plaintiff does not appear to dispute that Dr. Jones, based on her education, training, and experience in agricultural and biosystems engineering and farm management, qualifies as a POSITA with regard to temporary storage systems and can express informed opinions relating to non-infringement and invalidity of the '550 Patent. (Doc. 286 at 2-3.)  *Cf. Sundance, Inc. v. DeMonte Fabricating, Ltd.*, 550 F.3d 1356, 1363 (Fed. Cir. 2008) ("where an issue calls for consideration of evidence from the perspective of one of ordinary skill in the art, it is contradictory to Rule 702 to allow a witness to testify on the issue who is not qualified as a technical expert in that art.") Rather, Plaintiff argues some of Dr. Jones' opinions go beyond this expertise. (*Id.*) The court agrees, in part.

Dr. Jones's opinions about the intent or state of mind of others are speculative and would not be helpful to a jury.  "Expert testimony as to intent, motive, or state of mind offers no more than the drawing of an inference from the facts of the case ... and permitting expert testimony on this subject would be merely substituting the expert's judgment for the jury's and would not be helpful to the jury." *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 497 (D. Del. 2019) (quoting *Siring v. Oregon State Bd. of Higher Educ.,* 927 F. Supp. 2d 1069, 1077 (D. Or. 2013)).   As a POSITA, Dr. Jones is qualified to offer opinions about technical aspects of the

claimed invention and the prior art and how, in her opinion, it affects the validity of the patent. That would include an opinion that claims in the '550 Patent are invalid because the prior art disclosed or anticipated elements of the claimed invention or because a modification of the prior art was obvious. *Cf. HVLPO2, LLC v. Oxygen Frog, LLC*, 949 F.3d 685, 688, , at *2 (Fed. Cir. 2020) ("Issues of infringement and validity 'are analyzed in great part from the perspective of a person of ordinary skill in the art,' such that a witness who is 'not qualified as an expert by knowledge, skill, experience, training, or education' in the pertinent art … [cannot] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'") (citation omitted.)

But opinions by Dr. Jones as to the applicants' intent or specific state of mind in obtaining the '239 or '550 Patents are not within the realm of her expertise. Accordingly, opinions by Dr. Jones concerning the applicants' intent and knowledge will be excluded.  This includes opinions such as: withholding prior art "must have been done with the specific intent to deceive" the PTO (Doc. 243-1 at 4); "Mr. Gummer was well aware" that the Western Ag prior art disclosed certain limitations when he made arguments to the PTO (Doc. 243-1 at 27); Plaintiff "knew Western Ag prior art contained those elements" when it distinguished another patent (*Id.* at 28); Plaintiff "knew that [Western Ag taught parallel straps in tunnels] when they made this statement to the examiner" (*Id.* at 30);  and Plaintiff "could not have made the arguments that ultimately persuaded the examiner to allow the claims if it had been honest and forthright." (*Id.*)  Defendant can present the facts to the jury and argue inferences of intent and knowledge, but it may not present expert opinions on Plaintiff's intent and state of mind.

Plaintiff also challenges Dr. Jones's opinion that the examiner "did not have a fair opportunity" to analyze Western Ag prior art because it was disclosed late in the prosecution. (Doc. 243 at 4.)  The court agrees this opinion must be excluded.  Defendant concedes Dr. Jones

has no expertise in patent prosecution or procedures. (Doc. 272 at 4.)  Aside from the apparent subjectivity of what amounts to a "fair" opportunity to assess prior art, any opinion on this subject would necessarily require a familiarity with patent procedures that Dr. Jones – an expert on temporary storage systems – concededly does not possess.

Plaintiff next seeks to exclude an opinion by Dr. Jones that, had the Western Ag prior art been made known to the patent examiner, "the claims of the '239 Patent would not have been allowed." (Doc. 243 at 4.)  In response, Defendant acknowledges that "expert testimony regarding the examiner's intent is speculative," but argues a POSITA can testify as to "whether the omitted information would have been material to an examiner and technical aspects of the omitted material."  (Doc. 271 at 4.)  The court concludes the motion to exclude this opinion should be granted.  Dr. Jones has no expertise in the procedures, methods, or standards used by patent examiners or in patent prosecution generally.  The court will therefore exclude any opinion by her as to what the patent examiner would have done had the Western Ag prior art been disclosed earlier or what "directly led to the withdrawal of the examiner's rejections and allowance of claims." (Doc. 243 at 4.)  These are not opinions within her expertise on temporary grain storage systems. As Defendant points out, however, Jones is qualified to discuss the technical aspects of the omitted material and to offer opinions about how the prior art affects the validity of the patent and its claims.  Consistent with *Meds. Co. v. Mylan Inc.*, Dr. Jones may thus "provide factual context to support [Defendant's] theories of inequitable conduct, but [she] may not speculate as to 'what the Patent Office Examiner would have concluded.'"  2014 WL 1257957, at *5. *See also Sundance, Inc.*, 550 F.3d at 1364 (indicating a person qualified in the art may testify as to invalidity, including anticipation and obviousness, and underlying questions "such as the nature of the claimed invention, the scope and content of prior art, the differences between the claimed invention and

25

the prior art, or the motivation of one of ordinary skill in the art to combine these references to achieve the claimed invention.")

   *iii. Jones' anticipation opinions.*  Dr. Jones expressed three opinions on anticipation; her ultimate conclusions are listed below.  Plaintiff argues each opinion constitutes inadmissible *ipse dixit* unsupported by any factual basis.  (Doc. 243 at 5.)

   a. <u>Anticipation - background</u>.  Anticipation refers to the prior invention or disclosure of an invention by another.  If a claimed invention was patented, described in a printed publication, in public use, on sale, or otherwise available to the public before the filing date of invention, the prior art may be said to "anticipate" the patent and render it invalid for lack of novelty under 35 U.S.C. § 102 (Pre-AIA).[7]  *See Finisar Corp. v. DirectTV Group, Inc.*, 523 F.3d 1323, 1334 (Fed. Cir.), *cert. denied,* 555 U.S. 1070 (2008).  To anticipate a claim, a prior art reference must disclose each claim limitation, either expressly or inherently, so that a POSITA could practice the invention without undue experimentation.  *See Peerless Indus., Inc. v. Crimson AV LLC,* 2017 WL 1192805, at *6) (N.D. Ill. Mar. 31, 2017) (citing *inter alia ClearValue, Inc. v. Pearl Rover Polymers, Inc.*, 668 F.3d 1340, 1344 (Fed. Cir. 2012)).  "A patent claim is invalid as anticipated only if each and every element of the claim is expressly or inherently disclosed in a single prior art reference." *Kingston Tech. Co., Inc. v. SPEX Techs., Inc.,* ___F. App'x ___, 2020 WL 864876, at *3 (Fed. Cir. Feb. 21, 2020) (citations omitted.)  Moreover, the single prior art disclosure of all the elements of the claimed invention must be "arranged as in the claim."  *Finisar Corp.*, 523 F.3d at 1334. "Unless a reference discloses within the four corners of the document not only all of the limitations claimed but also all of the limitations arranged or combined in the same way as recited in the claim,

---

[7] The America Invents Act ("AIA"), which amended a number of patent statutes, applies to certain patent claims with an effective filing date after March 16, 2013.  *See* Pub. L. No. 112-29, § 3(n)(1), 125 Stat. 284, 293 (2011).  The parties agree that, based on the effective filing date of the '550 Patent, pre-AIA law applies to this action.  *See* Docs. 239 at 12, 254 at 18 (citing pre-AIA statutes).

it cannot be said to prove prior invention of the thing claimed and, thus, cannot anticipate under 35 U.S.C. § 102." *Net MoneyIN, Inc. v. VeriSign, Inc*., 545 F.3d 1359, 1371 (Fed. Cir. 2008). "[D]ifferences between the prior art reference and a claimed invention, however slight, invoke the question of obviousness, not anticipation." *Id.*

b.  Opinions.

(1)  The "cable pockets" prior art anticipates Claims 8, 9, and 11 of the '550 Patent. (Doc. 243-1 at 19.) [8]  Plaintiff argues that Claims 8, 9, and 11 each have an element of a "tightening mechanism," but Dr. Jones failed to identify or analyze the existence of any tightening mechanism in the cable pockets prior art.  (Doc. 243 at 6-7.)  In response, Defendant points out that Jones identified the use of winches – i.e., tightening mechanisms – in Raven tarp systems with cable pockets sold in 2008. (Doc. 272 at 5.) In reply, Plaintiff argues this reference fails to identify a tightening mechanism used at the same time a board is secured to the retaining wall, which Plaintiff asserts is an element of each claim.  (Doc. 286 at 3.)

The court will deny the motion to exclude this opinion, without prejudice to Plaintiff reasserting it at trial. Plaintiff's initial brief, although it mentioned the requirement of a retaining wall, only argued the opinion was unsupported because it failed to identify a tightening mechanism. (Doc. 243 at 6.)  Dr. Jones in fact identified such a mechanism in her report, as Defendant pointed out in response.  The court will not exclude the opinion based on a new argument raised for the first time in a reply brief.  *See Holick v. Burkhart,* 2019 WL 6771747, at *2, n.4 (D. Kan. Dec. 12, 2019) (court does not consider new arguments raised for the first time in a reply brief.)

---

[8] Dr. Jones expressed opinions as to other claims as well, but Claims 8, 9, and 11 of '550 Patent are the only claims still at issue.

(2) <u>The Western Ag prior art anticipates Claims 8 and 11 of the '550 Patent</u>. (Doc. 243-1 at 20.)  Plaintiff first argues Dr. Jones failed to identify a tightening mechanism in the Western Ag prior art.  (Doc. 243 at 7.) Plaintiff also argues Jones had no factual support for her assertion that the Western Ag prior art included tarps secured to a retaining wall <u>with boards</u>, which is an additional element of Claims 8 and 11. (*Id.*)  To the extent Jones identified those elements in the Western Ag prior art, Plaintiff argues she did so by referencing two different systems, contrary to the law requiring that all elements appear in a single prior art reference.  (*Id.* at 7-8.)

Defendant's response to these arguments is not a model of clarity.  (Doc. 272 at 8-9.) Defendant first argues that Dr. Jones "does not have to limit her opinion to a single installation of Western Ag's tarps."  (*Id.* at 8.)  This appears to be contrary to well-established law that "[a] patent claim is invalid as anticipated only if each and every element of the claim is expressly or inherently disclosed in a single prior art reference."  *Kingston Tech. Co., Inc.,* 2020 WL 864876, at *3.  Defendant next argues that Dr. Jones adequately "identified a board in her report" because she stated that "Western Ag's products encompassed each of the elements of [Claims 8 and 11]," and a board is an element of those claims.  (Doc. 272 at 8.)  This circular reasoning is insufficient to show admissibility of the opinion. *See Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC,* 381 F.3d 1142, 1152 (Fed. Cir. 2004) (testimony concerning anticipation typically must explain in detail how each claim element is disclosed in the prior art reference; testimony is insufficient if it is merely conclusory).  Defendant's third argument is that even if Dr. Jones's opinion is incorrect or inadmissible, the testimony of Plaintiff's expert (Jeffery Decker) shows that securing a tarp to a wall "is inherently known by those of skill in the art…."  (Doc. 272 at 9.)  This argument fails on multiple grounds.  An element is inherently disclosed only if it "is necessarily present" – not merely "known by" persons skilled in the art – and, moreover, Decker's testimony does not cure

a deficiency in Dr. Jones's analysis. *See Kingston Tech. Co., Inc.*, 2020 WL 864876, at *4 (citation omitted.)  Defendant's fourth argument, which makes a generalized claim that Dr. Jones's opinion is reliable without addressing the requirements of anticipation, likewise fails to show the admissibility of the opinion.  (Doc. 272 at 9.)  The court accordingly grants the motion to exclude Jones' opinion that the Western Ag prior art anticipates Claims 8 and 11.

(3) Powerfill prior art anticipates Claims 8, 9, and 11 of the '550 Patent (*Id.* at 21).  Plaintiff argues this opinion is unsupported because Dr. Jones fails to identify the use of a retaining wall or board with the quoted Powerfill cover. (Doc. 243 at 8.)  In response, Defendant argues it is irrelevant that the Powerfill prior art does not disclose a board and wall because the Powerfill cover encompasses the same design as Defendant's accused Fortress Internal Strap System.  (Doc. 272 at 10-11.) Defendant argues an alleged infringer can show invalidity in such circumstances without an element-by-element analysis.  (Doc. 272 at 10-11) (citing *Evans Cooling Sys., Inc. v. Gen. Motors Corp.,* 125 F.3d 1448 (Fed. Cir. 1997)).[9]  Defendant also argues that "[t]he use of the Powerfill cover with walls and boards is inherent."  (*Id.* at 11.)

Defendant has failed to show that Dr. Jones's opinion concerning Powerfill prior art was based on a proper application of the standards governing anticipation.  Anticipation is established only "if each and every element of the claim is expressly or inherently disclosed in a single prior art reference." *Kingston Tech. Co., Inc.*, 2020 WL 864876, at *3.  Prior art that does not include a retaining wall and a board secured to the wall therefore fails to anticipate Claims 8, 9, and 11 of the '550 Patent, because those items are elements of the claims.  *See* Doc. 243-4 at 18.  Dr. Jones did not account for these elements in her opinion. (Doc. 243-1 at 20-21.)  The *Evans* case cited by Defendant does not alter this conclusion.  *Evans* turned on application of the principle that claim

---

[9] *See Helsinn Healthcare S.A. v. Teva Pharm. USA, Inc.,* No. 16-1284, 2018 WL 15830301, at *5 (Fed. Cir. Jan. 16, 2018) (O'Malley, J., concurring) (stating *Evans* was abrogated by *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55 (1998)).

terms must be construed the same way for both invalidity and infringement.  *See 01 Communique Lab., Inc. v. Citrix Sys., Inc.*, 889 F.3d 735, 743 (Fed. Cir. 2018).  That means a patentee may not assert that claim terms mean one thing when applied to an accused product but mean another thing when applied to prior art.  *Id.  Evans* involved a sale of the identical engine cooling system both before and after it was patented.  So, when the patentee alleged that that the accused product infringed the patent, and the accused infringer conceded that point while seeking judgment based on a prior sale of the same product, the accused infringer had met its burden of showing that the prior art embodied all the elements of the patented invention.  *Evans*, 125 F.3d at 1451.  That principle does not help Defendant, which is accused of contributory infringement, and whose accused product is merely a component that does not embody all the elements of Claims 8, 9, and 11. To establish anticipation, Defendant has the burden of showing a single prior art reference that embodies *all* the elements of the claims.  As Plaintiff points out, Dr. Jones did not opine that the Powerfill cover was used with a retaining wall and a board secured to the wall.  Her opinion that the Powerfill prior art anticipates Claims 8, 9, and 11 thus failed to apply the proper method of analysis and is inadmissible.  The court likewise rejects Defendant's argument that the opinion was nevertheless proper because use of the Powerfill cover "with walls and boards is inherent." (Doc. 272 at 11.)  Dr. Jones nowhere addressed such an argument in her analysis or provided any basis that would support it.  *See Acoustic Tech., Inc. v. Itron Networked Solutions, Inc.*, 949 F.3d 1366, 1373 (Fed. Cir. 2020) ("the dispositive question is whether a skilled artisan would 'reasonably understand or infer' from a prior art reference that every claim limitation is disclosed in that single reference.")

*iv. Dr. Jones's obviousness opinions.*  Dr. Jones opined that the asserted patent claims are invalid for obviousness under 35 U.S.C. § 103.  Among other things, she asserted that five

combinations of elements from systems on sale prior to the critical date of the '550 Patent would be obvious and render the '550 Patent invalid.  (Doc. 243-1 at 21-25.)  Plaintiff contends that Dr. Jones's conclusions with respect to these five combinations all constitute unsupported *ipse dixit* and should be excluded. The court addresses these five combinations *infra*.  The court notes however, that Dr. Jones expressed other opinions on obviousness as well, including opinions based on the prior art as a whole.  (*See e.g.*, Doc. 243-1 at 13-16, 18) ("It would be obvious to a person with ordinary skill in the art to combine these to cover grain in piles for storage.")

a. Obviousness - background.  A patent may not be obtained if the differences between the subject matter claimed and the prior art are such that the subject matter as a whole would have been obvious to a POSITA at the time the invention was made.  *See* 35 U.S.C. § 103 (Pre-AIA). To allow a patent for a combination that only "unites old elements with no change in their respective functions … withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men."  *KSR Intern. Co. v. Teleflex Inc.,* 550 U.S. 398, 416 (2007) (citation omitted.)

In *KSR,* the Supreme Court rejected the Federal Circuit's overly-narrow approach to obviousness, instead endorsing "a properly flexible obviousness inquiry" that is "not subject to a rigid formula."  *See Google LLC v. Koninklijke Philips N.V.,* 795 F. App'x 840, 843 (Fed. Cir. 2020) (citation omitted).  *KSR* held that it was error to look only to the problem the patentee was trying to solve, because the question is not whether the combination was obvious to the patentee but whether it was obvious to a person with ordinary skill in the art.  *KSR,* 550 U.S. at 420.  It was also error to assume that a POSITA would be led only to those elements of prior art designed to solve the same problem, because familiar items may have obvious uses beyond their primary purpose, and a POSITA will be able to fit the teachings of multiple patents together "like pieces

of a puzzle." *Id.* Additionally, *KSR* said it was error to say that a patent cannot be proved obvious

merely by showing that the combination of elements was "[o]bvious to try." *Id.* This is so because:

> When there is a design need or market pressure to solve a problem and there are a
> finite number of identified, predictable solutions, a person of ordinary skill has
> good reason to pursue the known options within his or her technical grasp. If this
> leads to the anticipated success, it is likely the product not of innovation but of
> ordinary skill and common sense. In that instance the fact that a combination was
> obvious to try might show that it was obvious under § 103.

*Id.* Finally, although a factfinder should be aware of the distorting effects of hindsight (*i.e.*, reading

the teachings of the invention into the prior art), "[r]igid preventative rules that deny factfinders

recourse to common sense" are inconsistent with Supreme Court case law. *Id.*

Obviousness is a question of law based upon underlying questions of fact. *Fox Factory,*

*Inc. v. SRAM, LLC,* 944 F.3d 1366, 1372 (Fed. Cir. 2019) (citation omitted). The underlying

questions of fact include: (1) the scope and content of the prior art, (2) differences between the

prior art and the claims at issue, (3) the level of ordinary skill in the pertinent art, and (4) the

presence of evidence of secondary considerations, such as commercial success, long-felt but

unsolved needs, failure of others, and unexpected results. *Id.* (citing *Graham v. John Deere Co.*

*of Kan. City,* 383 U.S. 1, 17 (1966)).

 "[W]hen a patent claims a structure already known in the prior art that is altered by the

mere substitution of one element for another known in the field, the combination must do more

than yield a predictable result" to be patentable. *KSR*, 550 U.S. at 416. "When a work is available

in one field of endeavor, design incentives and other market forces can prompt variations of it,

either in the same field or a different one." *Id.* at 417. If a person of ordinary skill "can implement

a predictable variation, § 103 likely bars its patentability." *Id.* Similarly, if a technique has been

used to improve one device, and a POSITA "would recognize that it would improve similar devices

in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *Id.*

The inquiry can be more difficult where the claimed subject matter involves more than the simple substitution of one known element for another or mere application of a known technique to a piece of prior art. *Id.* Often, the court will have to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue. *Id.* at 418. "When several prior art references are combined[,] a claimed invention is not obvious unless a person having ordinary skill in the art would have been motivated to combine the references." *Artic Cat Inc. v. Polaris Indus., Inc.,* 795 F. App'x 827, 832-33 (Fed. Cir. 2019) (citing *KSR*, 550 U.S. at 418.) "The motivation to combine prior art references can come from the knowledge of those skilled in the art, from the prior art reference itself, or from the nature of the problem to be solved." *Acoustic Tech., Inc.,* 949 F.3d at 1375 (citing *PGS Geophysical AS v. Iancu*, 891 F.3d 1354, 1365 (Fed. Cir. 2018)). In making this assessment, the court considers whether a POSITA "would have been motivated to combine the prior art to achieve the claimed invention and whether there would have been a reasonable expectation of success in doing so." *Fox Factory, Inc. v. SRAM, LLC,* 944 F.3d 1366, 1373 (Fed. Cir. 2019).

b. Opinions.

(1). Western Ag and Union Iron. Dr. Jones opined that a POSITA would have been motivated to combine these two systems, which she said teach all the elements of the '550 Patent. (Doc. 243-1 at 22-23.) Plaintiff argues that Dr. Jones fails to include any allegation that these references disclose a tightening mechanism and fails to analyze any objective factors of non-obviousness. (Doc. 243 at 11.)

The court denies the motion to exclude this opinion. Defendant points to deposition testimony indicating that Dr. Jones identified a tightening mechanism in the Western Ag prior art. (Doc. 272 at 6-7, 13.) Dr. Jones's report also asserts that the Western Ag prior art included "straps tightened down by an adjustable mechanism" (Doc. 243-1 at 22), and that a POSITA would have been motivated to combine Union Iron's wall system and Western Ag's tarp system to provide a system meeting all the elements of the '550 Patent claims, including that of "a ratchet mechanism." (*Id.*) Plaintiff's reply does not address these matters. (Doc. 286.) Nor does Plaintiff identify the factors Dr. Jones allegedly failed to consider in reaching her opinion. Dr. Jones considered appropriate factors and explained the reasoning behind her opinion. To the extent Dr. Jones may have failed to thoroughly consider some factor relevant to obviousness, that would be an appropriate matter for cross-examination but does not warrant exclusion of the opinion.

(2). <u>Cable Pockets and Union Iron</u>. Plaintiff complains that Dr. Jones does not cite evidence to support her opinion that combining these systems meets the elements of the '550 Patent claims, that she speculates on the elements of the prior art, and that she "haphazardly" offers an opinion without considering any factors of non-obviousness. (Doc 243 at 11-12.)

Dr. Jones's report describes prior art of Raven and Integra (the cable pockets prior art) that included a quadrant system containing pockets for cables, with the four sections of a cover anchored to a retaining wall using a board and batten strip system. (Doc. 243-1 at 19.) Union Iron had a system that used tarp covers with retaining walls in which a board was secured to the wall, with the tarp running under the board and over the wall. (*Id.* at 13.) The report states that the Raven and Integra systems "were designed to be used in conjunction with wall systems such as those sold by Union Iron since at least 2000." (*Id.* at 23.) Dr. Jones opines that a POSITA would have been motivated to combine these systems "because they were designed to be used together."

(*Id.*)  Dr. Jones also opines that doing so meets all the elements of the asserted claims of the '550 Patent.  (*Id.*)  Although the latter assertion does not specifically discuss the elements of the '550 Patent claims, the report elsewhere sets for Dr. Jones's understanding of those elements.  (*Id.* at 13.)  Although the analysis provided by Dr. Jones in connection with this opinion is less than extensive, in view of the assertion that the cable pockets prior art was specifically designed to be used with a system like Union Iron's, the court concludes the motion to exclude the opinion should be denied.  The assertion, if proven, could adequately explain why a POSITA would be motivated to combine these systems.

    (3).  <u>Powerfill and Union Iron</u>.  Plaintiff contends Dr. Jones's opinion that a POSITA would be motivated to combine these two systems is generic and conclusory.  (Doc. 243 at 12-13.)

    The motion to exclude this opinion will be denied.  According to Dr. Jones's report, the Powerfill system disclosed a cover for a hoop building, a structure which is typically used for storage of bulk material.  (Doc. 243-1 at 21.)  The tarp cover had pockets parallel to each other and straps inserted through the pockets, with the straps extending beyond the ends of the pockets to be fastened down to a ratchet and anchoring device.  (*Id.*)  Union Iron had a system that used tarp covers with retaining walls in which a board was secured to the wall, with the tarp running under the board and over the wall.  (*Id.* at 13.)  Dr. Jones cited testimony allegedly showing that Union Iron had been selling such systems since 2000. (*Id.* at 17.)  Dr. Jones's opinion includes a brief explanation of why a POSITA would have been motivated to combine these systems.  (Doc. 243-1 at 23-24.)  She said the combination would have been prompted "because [of] the hoop building systems [that] are commonly used to store material and equipment in the ag industry." (*Id.* at 23.)  She asserted that the advantages of having pockets in tarps over hoop buildings would be obvious to workers who observe a hoop building tarp system present in many agricultural

facilities, and who need to secure tarps over grain piles without walking over the piles, which is both difficult and dangerous.  (*Id.* at 24.)  Again, this opinion is based on a consideration of appropriate factors.  Any shortcoming in the analysis of the motivation that would prompt a POSITA to combine these systems is a matter for cross-examination. *Cf. Acoustic Tech.,* 949 F.3d at 1375 ("The motivation to combine prior art references can come from the knowledge of those skilled in the art, from the prior art reference itself, or from the nature of the problem to be solved.")

(4).  <u>Western Ag and Web Net</u>.  Plaintiff contends Dr. Jones's explanation of the motivation for combining these two systems is generic and insufficient to show that the opinion is reliable. (Doc. 243 at 13-14) (citing *ActiveVideo Networks, Inc. v. Verizon Commc'ns.,* 694 F.3d 1312 (Fed. Cir. 2012)).

The court denies the motion to exclude this opinion.  Dr. Jones's report asserts that the Web Net system, whose elements she listed, taught every claim in the '550 Patent "except it had no pockets or tunnels for straps."  (Doc. 243-1 at 24.)  She asserted that Western Ag sold tarps with pockets and freely movable straps as early as 1999.  (*Id.*)  Dr. Jones opined that a POSITA would have been motivated to combine the foregoing systems "so that workers would not have to climb on the bulk material pile, risking their own safety, to manage the network of webbing while the tarp straps would be managed with the winches at the ground/wall level." (*Id.*)  Dr. Jones said "[i]t would be an easy combination for a [POSITA] to bring these two systems together…."  (Doc. 243-1 at 24.)  Again, Dr. Jones considered appropriate factors in reaching the opinion, including examining the elements of the prior art versus the claimed invention, the nature of the problem to be solved, the knowledge of a POSITA familiar with the prior art, and whether there would have been a reasonable expectation of success in combining these systems.  In this respect, the opinion differs materially from the *ActiveVideo Networks* case relied on by Plaintiff, where an expert

opined that a POSITA would be motivated to combine two prior systems merely "because you want to build something better" and "could do something new that [you] hadn't been able to do before." *ActiveVideo Networks,* 694 F.3d at 1328.

(5).   Western Ag with Wolstenholme and/or Ligas.   Plaintiff contends Dr. Jones failed to analyze whether these references disclosed the use of a board or a tightening mechanism and did not state why it would have been obvious to add these elements.  (Doc. 243 at 14.)  Plaintiff also argues Dr. Jones failed to explain the motivation for a POSITA to combine these references.  (*Id.* at 15.)

The motion to exclude this opinion is denied.  Dr. Jones's report asserts that Wolstenholme and Ligas disclosed a grain pile covering system with walls meeting the requirements of the '550 Patent.  (Doc. 243-1 at 25.)  It further asserts that Western Ag prior art included tarps with pockets containing freely moveable and adjustable straps with an anchoring system.  (Doc. 243-1 at 20.) Dr. Jones cited evidence that the Western Ag tarp system was used with tarps and straps extending past a retaining wall and secured to the retaining wall with boards.  (*Id.*)  Dr. Jones opined that a POSITA would easily substitute winches for the Western Ag adjustable tightening system.  She explained that the substitution of winches would be obvious to a POSITA given the use of these devices in the trucking and fence/barn construction industries and based agricultural workers' familiarity with those industries.  Dr. Jones concluded "the convenience of a winch for frequent adjustments on grain piles would be an obvious substitution for the Western Ag tarp adjustment system." (Doc. 243-1 at 25.)  She said winches are a common instrument in the industry to adjust tightness of cables, ropes, and straps, and that a POSITA would be motivated to substitute a winch for a more cumbersome adjustment system. (*Id.* at 30.) The report shows Dr. Jones considered appropriate factors in reaching this opinion, including an examination of the elements of the prior

art and the invention, the nature of the problem to be solved, the knowledge of a POSITA, and the reasonable expectation of success in combining these systems.

v. *On-sale bar.*   Under 35 U.S.C. § 102 (Pre-AIA), no person is entitled to patent an invention that was "on sale" more than one year before the patent application was filed. *Pfaff v. Wells Elecs., Inc.,* 525 U.S. 55, 57 (1998).   An invention was "on sale" when it was "the subject of a commercial offer for sale" and "ready for patenting."  *Helsinn Healthcare S.A. v. Teva Pharm. USA, Inc.,* 139 S. Ct. 628, 630 (2019) (citing *Pfaff,* 525 U.S. at 67).

Plaintiff contends Dr. Jones's opinions relating to an on-sale bar are based on mere speculation because Dr. Jones was uncertain when Plaintiff first offered its internal strapping system for sale and admitted it could have been after the patent application filing date.  (Doc. 243 at 15.)  Plaintiff also argues the existence of the on-sale bar is a question for the jury, not an expert. (*Id.*)

Dr. Jones's report first asserted that *Defendant*, not Plaintiff, has been selling tarps with pockets and freely movable straps "since before February 3, 2011, the earliest possible critical date,"[10] and that Plaintiff's allegation that Defendant's product infringes the '550 Patent therefore means the on-sale bar invalidates the patent.  (Doc. 243-1 at 17, 18.)  Plaintiff's argument does not address Defendant's alleged sales prior to the critical date and provides no basis for excluding this opinion.

As for application of the on-sale bar due to sales of the invention by Plaintiff prior to the '550 Patent date, there are no such allegations in the Pretrial Order.  (*See* Doc. 237. *See also summary judgment analysis, infra, noting lack of any such allegation in the Pretrial Order.*)

---

[10] The "critical date" for the on-sale bar is one year prior to the filing date of the application. *See GS Cleantech Corp. v. Adkins Energy LLC,* 951 F.3d 1310, 1319 (Fed. Cir. 2020) (citation omitted.)  For purposes of the foregoing opinion, Jones assumed that the earliest '550 Patent filing date was February 3, 2012, the date on which Plaintiff filed Provisional Application No. 61/594,727. (Doc. 243-4 at 2.)

Accordingly, the court will grant Plaintiff's motion to exclude opinions of Dr. Jones concerning any on-sale bar arising from Plaintiff's sales.

    D.  <u>Michael Lewis - Opinions on Damages</u>.  (Docs. 244, 245, 270, 288.)

    Plaintiff seeks to exclude opinions of Defendant's proffered damage expert, Michael Lewis.   Among other things, Lewis offered opinions concerning Plaintiff's damages from Defendant's alleged infringement of the '239 Patent.  (Doc. 261-1 at 41.)  He also opined, with respect to the '550 Patent, that damages for Defendant's alleged infringement should be a running royalty rate of 9% applied to the appropriate royalty base. He calculated two different total damage figures based upon two possible royalty bases.  (*Id.*)

    Plaintiff argues that any opinions concerning the '239 Patent are irrelevant because Plaintiff has dismissed its claim regarding that patent.  Plaintiff additionally argues Lewis's opinion as to the '550 Patent is unreliable because Lewis misapplied two of the relevant factors governing determination of such royalties. (Doc. 244 at 1.)

    i. *Damages concerning the '239 Patent*.  In response to Plaintiff's challenge to the relevancy of Lewis's opinion relating to the '239 Patent, Defendant again argues that relevancy is not a proper *Daubert* challenge and should be determined at the time of trial.  (Doc. 270 at 3.)  The court rejects that argument for the reasons previously stated.  The court also rejects Defendant's unsupported contention that its counterclaim for inequitable conduct somehow makes Lewis's opinion relevant.  Defendant hypothesizes that Lewis's opinion could be relevant because "[i]t is possible that the lack of value to a 'parent' patent like the '239 may impact what a licensee would pay for a later issued 'child' patent," and it could thus impact the appropriate royalty rate for infringement of the '550 Patent. (Doc. 270 at 4.)  But a mere possibility – unsupported by reference to any citation showing that Lewis considered that issue – is not enough to show that admission of

the opinion "will help the trier of fact to understand the evidence or to determine a fact in issue." *See* Fed. R. Evid. 702(a).

ii. *Damages concerning the '550 Patent*.

a. Infringement damage standards. Damages for infringement of a valid patent must be "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer…." 35 U.S.C. § 284.[11] The court "may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances." *Id.*

There are two alternative measures of compensation for infringement: (1) the patentee's lost profits, and (2) the reasonable royalty the patentee would have received through arms-length bargaining. *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 27 (Fed. Cir. 2012) (citation omitted.) Regarding the second alternative, an accepted method of calculating a reasonable royalty comes from *Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), which set forth 15 factors "to provide a reasoned economic framework for a 'hypothetical negotiation, … [which] attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began.'" *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 27 (Fed. Cir. 2012) (citation omitted.) "When a hypothetical negotiation would have yielded a running royalty, the classic way to determine the reasonable royalty amount is to multiply the royalty base, which represents the revenue generated by the infringement, by the royalty rate, which represents the percentage of revenue owed to the patentee." *Id.* The Federal Circuit does "not require that witnesses use any or all of the *Georgia-Pacific* factors when testifying about damages in patent cases," but if an expert chooses to use

---

[11] In cases of willful infringement, the court may also increase the damages up to three times the amount found by the jury or assessed by the court. *Id.*

them, the witness must do more than simply recite the factors and make conclusory remarks about their impact. *Id.* at 31.

b. Apportionment. Number 13 of the *Georgia-Pacific* factors addresses apportionment of damages by calling for consideration of: "The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer." *Georgia-Pacific,* 318 F. Supp. at 1120. This factor calls for profits attributable to non-patented items or non-inventive elements to be apportioned out for purposes of calculating a reasonable royalty. Plaintiff contends the invention claimed in the '550 Patent contains two elements – a tarp body element and tarp pocket elements – and that Lewis wrongfully apportioned out the profit or value related to the tarp body despite it being a patented feature. (Doc. 245 at 6.)

For reasons discussed herein, the court rejects the argument that Lewis's method of apportionment requires exclusion of his opinion. Federal Circuit case law provides that in apportioning the value of the invention, a reasonable royalty "must be based on the *incremental* value that the patented invention adds to the end product." *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods,* 879 F.3d 1332, 1348 (Fed. Cir. 2018) (emphasis added). As a result, "[w]hen a patent covers the infringing product as a whole, and *the claims recite both conventional and unconventional elements*, the court must determine how to account for the relative value of the patentee's invention in comparison to the value of the conventional elements recited in the claim, standing alone." *AstraZeneca AB v. Apotex Corp.,* 782 F.3d 1324, 1338 (Fed. Cir. 2015) (emphasis added). Thus, where a patented claim consisted of a conventional lawnmower with an improved baffle, apportionment was required so that the patentee was "compensated for the patented improvement (i.e., the improved flow control baffle) rather than the entire mower."

41

*Exmark Mfg.,* 879 F.3d at 1348.  The apportionment rule does not necessarily mean the value of conventional elements must be subtracted from the value of the patented invention; the question is "how much new value is created by the novel combination, beyond the value conferred by the conventional elements alone." *AstraZeneca AB,* 782 F.3d at 1339.

As an alternative to the apportionment rule, the "entire market value" rule "allows for the recovery of damages based on the value of an entire apparatus containing several features, when the feature patented constitutes the basis for the consumer demand." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.* 904 F.3d 965, 978 (Fed. Cir. 2018).  But the law requires patentees "'to apportion the royalty down to a reasonable estimate of its claimed technology,' unless it can establish that its patented technology drove demand for the entire product." *Id.* (citation omitted.)  "[T]he entire market value rule is appropriate only when the patented feature is the sole driver of customer demand or substantially creates the value of the component parts." *Id.* at 979.

Lewis's report shows he expressly considered and applied these principles, and discussed them at length, in offering his opinion of a reasonable royalty for infringement of the '550 Patent. (Doc. 261-1 at 16-19, 28, 31-34.)  Among other things, he noted that grain covers were commercially viable and were sold by both parties without the internal straps claimed by the '550 Patent, such that grain covers (i.e. the tarp body element) were conventional, non-patentable components of the claimed invention.  (*Id.* at 31.)  He opined that it would overcompensate Plaintiff to award damages for the entire market value of the grain cover.  (*Id.* at 18-19.)  He performed an analysis to calculate the incremental value of the patented internal straps which included a comparison of the pricing of grain covers sold with the internal straps and those sold without such straps.  (*Id.* at 31-32.)  Contrary to Plaintiff's suggestion, he did not ignore the

foregoing principles but expressly considered and applied them in his analysis.  Plaintiff has shown

no basis for excluding the opinion.

      c.  <u>Comparable licenses and royalty rates</u>.  *Georgia-Pacific* factor number 12 calls for

consideration of: "The portion of the profit or of the selling price that may be customary in the

particular business or in comparable businesses to allow for the use of the invention or analogous

inventions." *Georgia-Pacific,* 318 F. Supp. at 1120.  Plaintiff argues Lewis improperly considered

royalty rates for a number of patent licenses in the field of agri-business generally without knowing

or verifying that they were in fact comparable to the business and technology at issue in this case.

(Doc. 245 at 8.)

      Lewis's report shows he considered this *Georgia-Pacific* factor but was "not … able to

identify licenses for comparable technologies…."  (Doc. 261-1 at 19.)  Lewis proceeded to review

royalty rates in the market through an intellectual property database with publicly available royalty

rate information (ktMine).  (*Id.*)  When he narrowed his search to the agri-business industry, he

found a range of royalty rates between 1% and 7.5%.  *Id.* at 20. Lewis recognized this overview

did not account for the specific technology at issue and therefore "is not directly applicable" to

determining a reasonable royalty rate. *Id.* He nevertheless opined the overview is relevant "in

helping assess the reasonableness of an already determined royalty rate," and said it showed the

determination of a 35% royalty by Plaintiff's expert was "extremely high" and "inconsistent with

the vast majority of royalty rate observations in the licensing market." *Id.*  Lewis also cited a 2012

KPMG study across all industries on the relationship between royalty rates and profitability.  *Id.*

at 20-21.  Using formulas from that study, he predicted royalty rates between 4% and 9.1%, with

an average of 6.1%, based on Defendant's profit margins.  *Id.* at 21-22.  Lewis concluded these

results were consistent with the ktMine results and further indicated a 35% royalty rate was "out

of line with actual observed license agreements." *Id.* at 22.  He additionally referred to this analysis in finding that a majority of royalty rates for agricultural and related industries fell between 2% and 9% of revenue. (*Id.* at 31.)

The court will grant Plaintiff's motion in part.  Specifically, the court will exclude opinions that are based on considerations of royalties across the market as a whole or in industries having no demonstrable connection to the facts of this case.  The Federal Circuit has taken a somewhat narrow view of relevance in the context of comparable royalty data, emphasizing that "there must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case."  *Uniloc USA, Inc. v. Mircrosoft Corp.,* 632 F.3d 1292, 1317 (Fed. Cir. 2011) (rejecting expert's use of 25% rule-of-thumb as starting basis for determining royalty.) This standard does not eliminate examination of factor 12, which looks at customary practices in the particular business, but requires that any such evidence be "tied to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations that would have taken place in light of those facts and circumstances…." *Id.* at 1317-18.

Plaintiff has not shown that Lewis's method of resorting to agricultural industry ("agri-business") and relating industry licensing data, in the absence of specific data on the technology at issue, was improper or renders his opinions unreliable.  Lewis acknowledged the differences between the specific and general data, used the broader market data to the limited extent he found it relevant, applied it to the facts of the case, and thoroughly explained his method and reasons for doing so. Lewis's report also shows he did not use this data to determine a specific royalty rate, but rather to identify a range of royalties within agricultural and related industries, and to thereby confirm the reasonableness of his opinion as to the proper royalty. "[W]here the methodology is reasonable and its data or evidence are sufficiently tied to the facts of the case, the gatekeeping

role of the court is satisfied, and the inquiry on the correctness of the methodology and of the results produced thereunder belongs to the factfinder." *Summit 6, LLC v. Samsung Elecs. Co., Ltd.,* 802 F.3d 1283, 1296 (Fed. Cir. 2015). The method used by Lewis in this regard is both reasonable and sufficiently tied to the facts of the case, at least insofar as data related to agri-business licensing is concerned. The motion to exclude such opinions is denied both as to the royalty data noted above and Lewis's ultimate opinions as to a reasonably royalty.

Plaintiff's motion specifically challenges Lewis's use of the KPMG study. (Doc. 245 at 11-12.) Defendant does not address that argument except to assert in a footnote that the study "contains almost 4,000 data points." (Doc. 270 at 13, n.2.) The court will grant Plaintiff's motion to exclude any opinions or discussion by Lewis of the KPMG study or its effect on calculation of a reasonable royalty. Lewis's report indicates the KPMG study was based on licensing practices across a wide range of industries and was not limited to businesses comparable in any way to the temporary grain storage industry. As such, it does not bear a sufficient connection to the facts of the case to warrant admission. *See Uniloc USA, Inc.,* 632 F.3d at 1318.

E. <u>Jeffrey Decker – Opinions on infringement</u>. (Docs. 249, 250, 265, 290.)

Defendant moves to exclude opinion testimony from Jeffrey Decker, Plaintiff's proffered technical expert. Defendant argues Decker is not qualified to express the opinions; that his opinions are not based on sufficient facts or data; that his opinions are not the product of a reliable methodology; and that the testimony includes impermissible legal opinions. (*See* Doc. 250.)

i. *Qualifications*. Defendant contends Decker is not qualified to express opinions on infringement because this is his first time as an expert on patent infringement and he has no real experience with internal strapping systems. (Doc. 250 at 6.) The court rejects these arguments. Decker's CV is at Doc. 265-4. It shows he obtained a bachelor's degree in 1991 in industrial

technology (applied engineering) from Eastern Illinois University.  (*Id.* at 3.) He has worked in the agriculture industry for over 30 years, primarily with The GSI Group, Inc., in various positions including Design Draftsman, Engineering Product Manager, and Senior Safety Product Specialist. (*Id.* at 2-3.)   Since 2013 he has been the president and owner of Decker Consulting and Investigations, Inc. (*Id.* at 2.) He has designed and developed systems that relate to grain or bulk storage and has patented two such systems.  (*Id.* at 4.) He has professional affiliations relating to the grain storage industry, has designed and developed systems relating to the industry, and has published articles relating to grain storage systems and their design.  (*Id.* at 4.)  "The dispositive question with regard to qualification is whether the opinion is 'within the reasonable confines' of the expert's subject area." *Holt v. Wesley Med. Ctr., LLC,* No. 00-1318-JAR, 2004 WL 1636571, at *3 (D. Kan. July 19, 2004) (quoting *Burton v. R.J. Reynolds Tobacco Co.,* 183 F. Supp. 2d 1308, 1313-14 (D. Kan. 2002)). The fact that Decker never before testified as an expert on infringement is not dispositive; every witness who has testified as an expert once did so for the first time.  Nor does Decker's lack of prior personal experience with internal strapping systems necessarily preclude his offering any opinions about them.  Defendant's technical expert (Dr. Jones), prior to being contacted in this case, similarly had no personal experience with internal strapping systems and had never before performed an infringement or invalidity analysis.  (Doc. 265-5 at 3-4.) Decker's education, training, and experience in the area of engineering, grain storage, and design and development of systems related to grain storage show he qualifies as a person of ordinary skill in the art of temporary grain storage systems, and that his opinions and testimony relating to the industry, including his technical assessment of the elements of the claims at issue, are fairly within the confines of his subject area.

ii. *Sufficiency of facts and data*.  The opinions rendered by Decker include that Defendant's product offered for sale with an internal strap system is a material part of the invention in Claims 8, 9, and 11 of the '550 Patent; that it is not a staple article suitable for substantial, non-infringing use; and that the product contributorily infringes the '550 Patent.  (Doc. 265-1 at 12.)  Decker disputed Dr. Jones's assertion that there was no evidence of any direct infringement of the '550 Patent by any end user of Defendant's product.  He pointed to installation of Defendant's product at MKC in Yoder, Kansas, as evidence of direct infringement, as well as installations at four other sites he visited and photographed. (*Id.* at 12.)  Decker also stated that in accordance with the legal assumptions set forth in his report, he understood direct infringement could be proven by circumstantial as well as direct evidence.  (*Id.* at 11.)

Defendant argues that Decker has no reliable or factually supported basis for opining that there was any instance of direct infringement relating to a sale of Defendant's product.  Defendant asserts that it produced 1,770 invoices reflecting sales of Raven tarps with internal strapping systems.  (Doc. 250 at 6.)  Decker visited only 13 of the sites reflected in those sales; nine of them had no tarps installed at the time of his visit. (*Id.*)  Four sites had Defendant's tarps installed.  Defendant argues Decker lacks a proper factual basis for any opinion of direct infringement.  (*Id.*)  It first argues Decker has no factual basis to offer opinions concerning sites he never visited.  It next argues he has no factual basis for offering opinions as to the nine sites he visited that did not have Defendant's tarps installed.  Next, it argues Decker's infringement opinion is unsupported as to the remaining four sites he visited, because he made no investigation of when or how the tarps were installed or what product was stored under them.  (*Id.* at 6-7.)  (Defendant points out Decker conceded in his deposition that if a system was covering hay bales, it would not infringe the '550 Patent because hay was not a "bulk material" within the meaning of the patent. (*Id.* at 7.))  Finally,

Defendant argues Decker's opinion that there was direct infringement concerning the installation at MKC in Yoder is speculative because it is based on Decker's unwarranted assumption that a replacement tarp was installed in 2018.  (*Id.* at 3-4.)

The court rejects the argument that Decker's opinions should be excluded as speculative. Expert opinions must be based on facts which enable the expert to express a reasonably accurate conclusion as opposed to conjecture or speculation.  *Turck v. Baker Petrolite Corp.,* 10 F. App'x 756, 766 (10th Cir. 2001) (citing *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir. 1995)).  Turning first to the four sites visited by Decker at which he found Defendant's tarps installed, the court finds his opinion that the installations directly infringed the '550 Patent is supported by a sufficient factual basis to permit a reasonably accurate conclusion. Decker visually inspected and/or personally photographed the systems installed at these sites. (Doc. 265-1 at 10.) In his report, he compared the elements shown by his inspection and photographs with the elements found in Claims 8, 9, and 11 of the '550 Patent.  (*See id.* at 50-60.)  His viewing of the manner of installation, together with the other facts available to him, provides a sufficient factual basis for expressing an opinion on infringement.  Defendant argues the systems Decker photographed might have actually been non-infringing because they might have covered hay bales rather than grain. Even if the assertion that covering hay would not be an infringing use, that possibility does not render the opinions inadmissible.  Like other facts, a fact necessary to show direct infringement can be proven by circumstantial evidence.  *See Vita-Mix Corp. v. Basic Holding, Inc.,* 581 F.3d 1317, 1326 (Fed. Cir. 2009) ("Direct infringement can be proven by circumstantial evidence.") (citation omitted.) It would hardly be surprising if a jury inferred from the circumstances described by Decker that Defendant's self-described "grain covers" were in fact used at these facilities to cover grain. (*See* Doc. 192-3.) The same principle is true with respect to the MKC facility in Yoder,

48

as to which Decker expressed an opinion of infringement based in part on an inference that MKC installed Raven replacement tarps at that facility in 2018.  (Doc. 265-1 at 12.)  This opinion is not speculative as long as Plaintiff presents sufficient evidence at trial to allow a jury to reasonably infer that the Raven tarps were in fact installed as replacements in 2018 in a manner that infringed the patent.  The opinion is not rendered inadmissible simply because it depends in part on a fact that might be shown by circumstantial evidence.  The court thus rejects Defendant's contention that Decker "cannot opine to a single site of direct infringement other than by speculating…." (Doc. 250 at 12.)

Defendant additionally argues Decker should not be able to offer an infringement opinion as to any location he did not visit – in other words, as to nearly all of the 1,770 product sales reflected in Defendant's invoices.  (Doc. 250 at 13, n.8.)  Defendant points out that Decker admitted in his deposition he could not tell from invoices alone whether there was direct infringement at a site, because he would need to know whether the installation had walls or not. (*Id.* at 7-8.)  The court again rejects the argument that Decker's opinion must be excluded.  As an initial matter, it is not entirely clear what opinion Defendant is challenging, as neither party identifies any specific opinion from Decker concerning the balance of the sales shown in the 1,770 invoices.  Decker's report contains no express opinion concerning infringement at sites he did not visit.  The deposition excerpts cited by Defendant show that Decker was asked why he "assumed" the presence of a wall and board with the cover attached at the upper edge (apparently referring to the '239 Patent) with respect to the sites he did not visit. (Doc. 250-3 at 23.)  He indicated the presence of such elements was reasonably inferred in view of Defendant's instructions to install the cover in that manner and in view of normal industry practices.  (*Id.*)  He also opined that use

of the cover without a wall would essentially make the internal straps useless, as the user could not tension the straps on a flat pile without a wall.  (*Id.* at 38.)

Based on this record, the court will deny Defendant's motion to exclude any opinion from Decker concerning the balance of the 1,770 sites.  The denial is without prejudice to reasserting the objection at trial.  Decker cited a combination of circumstantial evidence and expert opinion in support of the inferences he drew, which is not in itself impermissible.  *See Alco Standard Corp. v. Tenn. Valley Auth.*, 808 F.2d 1490, 1503 (Fed. Cir. 1986) ("Although the evidence of infringement is circumstantial, that does not make it any less credible or persuasive."); *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1365 (Fed. Cir. 2012) ("This is not the first time we have concluded that where an alleged infringer designs a product for use in an infringing way and instructs users to use the product in an infringing way, there is sufficient evidence for a jury to find direct infringement.")  Moreover, as indicated previously, an expert opinion is not impermissible merely because it is based in part on assumed facts.  As long as Decker makes clear the factual assumptions or inferences on which his opinion rests, and evidence is introduced at trial that would support the assumptions, he can express an opinion on infringement at sites he did not visit.  *See Williams v. Illinois,* 567 U.S. 50, 57 (2012) ("Under settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true. It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert.")

iii.  *Reliable principles or methods*.  Defendant argues that, contrary to Rule 702, Decker "fails to apply *any* type of discernible methodology in forming or supporting his opinions…." (Doc. 250 at 13.)  This argument is largely a rehash of Defendant's prior assertions.  (*See id*.) (asserting Decker "barely inspected anything …, has no real experience … and no real supporting

data.")  Decker's method of gathering and examining evidence concerning use of Defendant's product, comparing it to the elements of the relevant claims in the '550 Patent, and offering resulting opinions based on his knowledge in the field of grain storage systems is largely the same method used by Defendant's technical expert.  Plaintiff has sufficiently demonstrated that Decker applied reliable principles and methods to the facts of the case.

iv.  *Impermissible legal conclusions*.  Defendant contends Decker offers legal conclusion in the guise of expert opinions as to substantial non-infringing uses of Defendant's product.  (Doc. 250 at 14-15.)  The court rejects this argument.  Like Dr. Jones, Decker cited and applied the relevant legal standard, which defines a substantial non-infringing as one that is "not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental."  *See Grunenthal GMBH,* 919 F.3d at 1340.  He resorted to a rational method in doing so:  he compared revenues from the non-infringing uses cited by Defendant with its overall revenues from the product.  He asserted that the claimed non-infringing uses would only amount to between 0.2% and 2.0% of Defendant's revenues for the product.  (Doc. 265-1 at 14.)  He also explained why he believed the use of the product without walls or as a single tarp, as posited by Dr. Jones, would be impractical and unusual.  (*Id.* at 13-14.)  These did not amount to impermissible legal opinions merely because Decker conceded in his deposition that he could not specify exactly what percentage of revenues would qualify as "substantial."  *Cf. Grunenthal GMBH,* 919 F.3d at 1340-41 (conflicting expert opinions as to whether use of product was unusual presented an issue of credibility for the factfinder).

F. Antoinette Tease – Opinions on Patent Practices and Procedures.  (Docs. 251, 252, 266, 289.)  Tease is a registered patent attorney who represents individuals and businesses in patent prosecution and enforcement actions.  (Doc. 266-1 at 3.)  She has extensive experience in patent prosecution and has written numerous articles on the subject.  Tease was asked "to render an

opinion as to whether the references listed on pages 4 and 5 of Raven Industries' October 12, 2018 invalidity contentions were considered by the examiner as evidenced in the file history of the '239 and '550 Patents."  (*Id.* at 19.)  Tease listed the references that were disclosed and stated whether and when each reference was considered by the examiner.  (*Id.* at 19-25.)  The references included the "Western Ag Hay Tarp (1999)," which she stated was listed on a disclosure statement filed by Plaintiff on August 18, 2017 "and considered by the examiner on September 12, 2017 during prosecution of the '550 Patent."  (*Id.* at 24.)

Defendant argues Tease's opinion should be excluded for three reasons, none of which the court finds persuasive.  First, it argues that because Tease is not a POSITA, "she is not permitted to opine about invalidity or inequitable conduct."  (Doc. 252 at 3.)  Tease's report, however, contains no opinions on those subjects. (*See* Doc. 266-1 at 19) ("I have not been asked to render an opinion as to the validity of the '239 and '550 Patents.")  Second, Defendant argues that Tease is speculating about "what the Patent Examiner did, or thought, or would have done if J&M had provided complete and full information…." (*Id.*)  Tease's opinion, however, appears to be limited to an assertion that the examiner "considered" the listed references.  That assertion has factual support in the record cited by Tease and is within the field of her expertise.  She explained in her report that the most common way of calling prior art references to the attention of the examiner was to file an Information Disclosure Statement ("IDS").  (*Id.* at 11.)  She said when an IDS was properly filed, the examiner has an obligation to consider the information (citing the Manual of Patent Examining Procedures). Based on her experience and knowledge of patent practices and rules, she stated that if any reference in the IDS is not considered, the examiner will strike through each citation not considered. (*Id.* at 12.)  Additionally, the examiner will stamp each page with a statement that "All references considered except where lined through…." (*Id.*)  She said in the

52

file history of the '550 Patent, the examiner filed two "Lists of References cited by applicant and considered by examiner" and did not strike through any of the references, instead indicating that "all references [were] considered."  (*Id.* at 12-13.)  Tease's resulting opinion that the examiner "considered" the references does not delve into or speculate about the thought process of the examiner.  It is essentially limited to an explanation of the practice of disclosing references and the fact that the examiner represented that the references had been considered.  Such testimony may be helpful to the trier of fact in understanding patent practice – something not within the common knowledge of most jurors (or judges) – and in determining whether the circumstances of the disclosure show or refute an inference that Plaintiff intended to mislead the Patent Examiner. Defendant can of course cross-examine Tease about the timing and extent of the disclosure.  (*See* Doc. 289 at 5) (asserting the examiner did not consider information learned from Western Ag in 2019.)  Defendant's motion to exclude Tease's testimony, however, is denied.

### V.  Cross-Motions for Summary Judgment (Docs. 238, 239, 277, 295; Docs. 253, 254, 293, 296.)

#### a. Summary Judgment Standards

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Sotunde v. Safeway, Inc.*, 716 F. App'x 758, 761 (10th Cir. 2017). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol—Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). The nonmovant must then bring forth specific facts

showing a genuine issue for trial. Id. The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

      b. **Plaintiff's Motion for Summary Judgment.** **(Docs. 238, 239, 277, 295.)**

      1.  <u>On-sale bar</u>.  As noted previously, under the on-sale bar a patent is invalid if the invention was "on sale" more than one year prior to the patent's application date.  35 U.S.C. § 102 (Pre-AIA.)  A patent is presumed valid, and the burden of establishing invalidity of the patent or any of its claims rests on the party asserting invalidity.  35 U.S.C. § 282.  The defense must be proven by clear and convincing evidence.  *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95 (2011).

      Plaintiff first argues it is entitled to a finding that the on-sale bar of § 102(b) does not invalidate the '550 Patent because (1) Defendant is procedurally barred from asserting the defense and (2) Defendant has no evidence of any pre-February 1, 2012 offers for sale of the invention. (Doc. 239 at 15.)  The court notes that these arguments are limited to any pre-February 1, 2012 offer-for-sale *by Plaintiff*. (Doc. 239 at 14-15.) Plaintiff notes that Defendant did not allege any sales by Plaintiff in its invalidity contentions, as required by a scheduling order, and argues that Defendant has no evidence showing such a sale before the critical date. (*Id.*)  In response, Defendant asserts that its invalidity contentions included an on-sale bar, but it points only to allegations of prior sales by entities other than Plaintiff – namely, Defendant (the Quadrant System), Integra (the Powerfill quote), Western Ag tarps, and Union Iron. (Doc. 277 at 6; Doc. 277-4.)  Defendant offers no explanation for not alleging that prior sales by Plaintiff rendered the '550 Patent invalid.  Moreover, there are no such allegations in the Pretrial Order.  The Pretrial Order controls the course of the action and is to be modified at this point "only to prevent manifest

injustice." Fed. R. Civ. P. 16(e).  Defendant has not sought to modify the Pretrial Order or show why it would be manifestly unjust not to modify it.  Accordingly, the court concludes Defendant is precluded from now asserting that the '550 Patent is invalid by reason of any sale of the invention by Plaintiff prior to February 1, 2012.  Plaintiff's motion is granted with respect to that contention. The foregoing ruling is limited, however, to alleged prior sales by Plaintiff.

2.  Anticipation.  Plaintiff next argues Defendant fails to cite evidence that the claims of the '550 Patent were anticipated by any of four asserted prior art references: Defendant's Quadrant System (cable pockets) tarps, the Integra Powerfill quote, Western Ag hay tarps, or the Union Iron system.  (Doc. 239 at 17-23.)

As noted previously, if a claimed invention was in public use, on sale, or otherwise available to the public before the filing date of the invention, the prior art has "anticipated" the patent and renders it invalid for lack of novelty under 35 U.S.C. § 102 (Pre-AIA).  *See Finisar Corp. v. DirectTV Group, Inc.*, 523 F.3d 1323, 1334 (Fed. Cir.), *cert. denied,* 555 U.S. 1070 (2008).  But to anticipate a claim, "a single prior art reference must expressly or inherently disclose each claim limitation," and the elements must be "arranged as in the claim."  *Id.*

Plaintiff first argues there is no evidence that any of Defendant's Quadrant System (or cable pocket) tarps sold before the critical date were installed in a manner meeting all the elements of Claims 8, 9, or 11.  As recounted previously, however, Defendant has cited evidence – including circumstantial evidence – from which a jury could reasonably conclude these previously sold tarps were in fact installed in such a manner. Plaintiff points out that Defendant's invoices showing sales of these tarps do not disclose a retaining wall, board, or tightening mechanism, but evidence, including testimony of Ralph Soles and Robert Hesse, would allow a jury to reasonably infer that the Raven tarps were installed with these elements present.  For example, Soles testified about how

55

cable pocket tarps sold by Defendant in 2008 were installed at Cargill facilities, how a tarp was attached to a wall, and how one end of the cables was attached to a winch.  Moreover, Plaintiff's own expert Jeffrey Decker asserted that a tarp with internal straps would be essentially useless without using a wall over which to tension the straps and that it was standard practice in the industry to attach a tarp to a retaining wall by attaching a board. Plaintiff argues that Soles's testimony is insufficient because "uncorroborated oral testimony, particularly that of interested persons recalling long-past events, does not, of itself, provide the clear and convincing evidence required to invalidate a patent." (Doc. 239 at 19) (quoting *Woodland Trust v. Flowertree Nursery, Inc.,* 148 F.3d 1369, 1369 (Fed. Cir. 1998)).  But the testimony here, unlike *Woodland*, is not totally uncorroborated; it is corroborated in part by contemporaneous invoices documenting tarp sales.  *Cf. Woodland Trust,* 148 F.3d at 1373 ("we take note of the absence of any physical record to support the oral evidence.")  Considering the evidence as a whole and drawing all reasonable inferences therefrom in favor of Defendant, Plaintiff has not shown it is entitled to summary judgment on this issue.  *Cf. Z4 Techs., Inc. v. Microsoft Corp*., 507 F.3d 1340, 1347 (Fed.Cir.2007) (anticipation is a question of fact, reviewed for substantial evidence when tried to a jury).

Plaintiff makes a similar argument with respect to the Powerfill quote.  (Doc. 239 at 20.) Again, the testimony of witnesses such as Robert Hesse, and other direct and circumstantial evidence, would allow a jury to reasonably find all the elements of the '550 Patent claims were contemplated in the offer of sale to Powerfill.  Plaintiff points out that a board was never disclosed in the Powerfill quote.  But again, Plaintiff's own expert said it was standard practice in the industry to attach a tarp to a retaining wall by attaching it with a board. (*See also* Doc. 237 at 6) (Pretrial Order) (setting forth Plaintiff's contention that Defendant's tarp with pockets and straps infringes "when it is installed using the standard method known and employed in the industry.")

On this record, a jury viewing the evidence in Defendant's favor could conclude that the Powerfill quote contemplated attachment to a retaining wall with a board and a tightening mechanism connected to the straps. The court also rejects Plaintiff's contention that because the Powerfill cover was never actually built or used it could not have anticipated the '550 Patent claims. (Doc. 295 at 8-9.) Anticipation applies not only to inventions actually sold or used, but also to inventions offered for sale. *See GS Cleantech Corp. v. Adkins Energy LLC,* 951 F.3d 1310, 1324-25 (Fed. Cir. 2020) (noting circumstances under which an offer for sale implicates the on-sale bar of 35 U.S.C. § 102(b)). *See also Pfaff,* 525 U.S. at 60, 63 (an "invention" refers to the inventor's conception rather than to the physical embodiment of the idea, such that it may be "on sale" before it is reduced to practice.)

The court reaches a similar conclusion as to the Western Ag tarps. In response to Plaintiff's assertion that no prior sales of Western Ag tarps disclosed the elements of a wall, tightening mechanism, or board, Defendant cites evidence that Western Ag tarps were installed as grain covers using hay bales as a retaining wall, that freely movable straps from the covers were secured to the wall using half-hitches as a tightening mechanism, and that it was standard practice in the grain storage industry to use a board to attach storage tarps to walls. (Doc. 277 at 24.) Plaintiff has not shown that in light of such evidence, a reasonable jury could not find the elements of Claims 8 and 11 of the '550 Patent with respect to installation of a Western Ag tarp. Plaintiff also repeats its contention that there was a distinction between Western Ag's "hay tarps" and "grain tarps" – and that evidence about one does not pertain to the other – but a jury could find from the evidence that there was no such distinction in Western Ag's products. Plaintiff also reiterates its argument concerning the insufficiency of uncorroborated testimony from an interested party, but Defendant has cited documentary evidence as well as testamentary evidence concerning sales of

Western Ag tarps. *Cf. Woodland Trust*, 148 F.3d at 1371 (finding invalidity burden could not be met where there was no physical evidence of any kind and an interested party testified about an alleged usage of the invention twenty to thirty years ago).   Plaintiff's motion for summary judgment on this issue is thus denied as to Claims 8 and 11.   The motion is granted with respect Claim 9, which requires in addition to the elements of Claim 8 that a winch was connected to at least one end of a strap.   Defendant's citation of vague testimony that Western Ag used a winch "every now and then" in windy conditions or for test purposes is insufficient to allow a jury to reasonably find a prior use meeting the elements of Claim 9.

As to the Union Iron system, Defendant's response does not argue that this prior art disclosed all the elements of the '550 Patent claims.   (Doc. 277.)   The court therefore grants Plaintiff's motion for summary judgment on this point and determines that Defendant cannot show that Union Iron prior art anticipates the '550 Patent claims.

3.   <u>Inequitable conduct</u>.  Plaintiff argues it is entitled to judgment on Defendant's counterclaim for inequitable conduct.   (Doc. 239 at 24.)

 "To prevail on the defense of inequitable conduct, the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO." *Therasence Inc.,* 649 F.3d at 1285.   This judge-made defense, which derives from the doctrine of "unclean hands," is "the atomic bomb" of patent law that renders an entire patent (rather than a specific claim) unenforceable.  *Id.* at 1288.  In part to discourage the indiscriminate assertion of the defense, the Federal Circuit has emphasized the need for clear and convincing evidence that the applicant knew of a reference, knew it was material, and made a deliberate decision to withhold it for the purpose of deceiving the PTO. *Id.* at 1290. Although intent to deceive may be inferred from circumstantial evidence, *Therasense* said an intent to deceive "must be 'the single most

reasonable inference able to be drawn from the evidence.'" *Id.*  Information is considered "material" when "a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent."  *Ring Plus, Inc. v. Cingular Wireless Corp.,* 614 F.3d 1354, 1360 (Fed. Cir. 2010) (citation omitted.)

Invoking these standards, Plaintiff first argues that Western Ag prior art cannot be considered material because the reference was in fact submitted to the PTO during prosecution of the '550 Patent and the PTO proceeded to issue the '550 Patent.  (Doc. 239 at 26.)  Defendant's response to this argument relies in part on opinions by Dr. Jones that the court has now excluded. (Doc. 277 at 25-26.)  But it also relies in part on evidence that there may not have been a full disclosure of the Western Ag prior art to the PTO, that the disclosure may have come after an agreement was already reached with the Examiner concerning allowance of the claims, and that Plaintiff may have had a legal duty under the circumstances to cure its omission of the Western Ag prior art from prosecution of the related '239 Patent.  (*Id.* at 29-30.) Under the circumstances, Plaintiff has failed to demonstrate that there is no genuine issue of material fact concerning this element of inequitable conduct.

The court similarly rejects Plaintiff's argument that Defendant has failed to cite any evidence of a specific intent to deceive the PTO.  Intent is ordinarily inferred from circumstantial evidence.  *Therasence Inc.,* 649 F.3d at 1290.  Defendant has cited evidence that the inventors of the '550 Patent not only knew of the Western Ag prior art, but one of them had extensive prior knowledge and experience with it, and the inventors discussed between themselves whether it posed an obstacle to the patent application.  The most reasonable inference, based on this limited record, is that the inventors were concerned that the Western Ag art would invalidate their claim of a new storage system comprising tarps with internal straps.  Despite that, and despite an apparent

overlap between Western Ag and the claimed invention, the Western Ag tarps were not disclosed during prosecution of the '239 Patent and were only disclosed at the tail end of the '550 Patent prosecution – and perhaps then only partially and after an agreement had already been reached with the Examiner.  Plaintiff argues there could have been no intent to deceive because Mr. Gummer testified he disclosed the Western Ag tarps to Plaintiff's patent attorney.  (Doc. 239 at 26-27.)  But Defendant cites evidence that it was unable to corroborate that assertion, and a jury would not have to accept the assertion as credible.  (Doc. 277 at 30-31.)  Plaintiff also argues that any alleged inequitable conduct in obtaining the '239 Patent cannot be a basis for invalidating the '550 Patent. (Doc. 239 at 30) (citing *Cordis Corp. v. Boston Sci. Corp.*, 641 F. Supp. 2d 353 (D. Del. 2009)).  But the portion of *Cardis Corp.* relied upon by Plaintiff appears to be dicta, as the court in that case rejected the inequitable conduct defense because the inferences in favor of and against deceptive intent were equally reasonable.  *Id.* at 359.  The judge went on to say that even had he concluded otherwise, the defendant had failed to prove that plaintiff's nondisclosure of prior art during an earlier prosecution affected a later prosecution.  *Id.*

The court recognizes that the fact of disclosure of the Western Ag tarps by Plaintiff to the Examiner in the '550 Patent weighs against any finding of inequitable conduct, but the nature of the disclosure and the circumstances under it occurred in this case leave open the possibility that the defense could be established under the totality of the evidence and if all reasonable inferences are drawn in Defendant's favor. *Cf. Consol. Aluminum Corp. v. Foseco Int'l Ltd.,* 910 F.2d 804, 810 (Fed. Cir. 1990) (inequitable conduct in prosecuting one patent that has an immediate and necessary relation to the relief sought may result in invalidation of a related patent.)  In short, the questions of intent to deceive and materiality turn on issues of fact that require a consideration of

the evidence as a whole.  Plaintiff has not shown an entitlement to summary judgment on the defense of inequitable conduct.

The above rulings make it unnecessary for the court to address Defendant's additional argument that summary judgment is precluded by application of the rule of *Vanmoor v. Wal-Mart Stores, Inc.*, 2013 F.3d 163 (Fed. Cir. 2000).  (Doc. 277 at 3.)

**c. Defendant's Motion for Summary Judgment (Docs. 253, 254, 293, 296.)**

1. <u>Western Ag prior art</u>.  Defendant asserts that "[f]or more than [ten] years, Western Ag has used its hay tarps to cover grain by making a perimeter wall out of hay bales, filling the inside with grain, then covering the grain pile with a hay tarp, and tying freely movable straps to either a strap coming out from underneath the hay or to twine on the hay using a half-hitch to cinch it down."  (Doc. 254 at 20.)  It also asserts that "every now and then" since 2010 Western Ag "has used a winch to tighten straps." (*Id.* at 19.)  Defendant argues that "Western Ag is just like the Raven Fortress [internal strapping system] in all material respects" and "[t]hus, these Western Ag sales invalidate [Plaintiff's] patent claims." (*Id.* at 20.)

The court found in addressing Plaintiff's motion for summary judgment that a jury could find the Western Ag prior sales met all the elements of the relevant '550 Patent claims.  But a jury could also reasonably find otherwise.  Whether stacked hay bales constituted a "retaining wall," whether a strap tied down with a half-hitch constitutes a "tightening mechanism," and whether testimony about the unspecified manner in which a winch was used "every now and then" credibly shows a prior use that invalidates a presumably valid patent are all genuine issues of fact.  A reasonable jury drawing inferences in Plaintiff's favor could find the Western Ag sales do not contain the elements of Claims 8, 9, and 11 of the '550 Patent.

2. <u>Defendant's cable pockets sales and the Powerfill quote</u>.  Defendant similarly argues that its cable pocket sales to Cargill in 2008 contained all the elements of the '550 Patent claims and thus invalidate the claims.  (Doc. 254 at 22-23.)  For the same reasons indicated above, a reasonable jury considering the evidence would not be compelled to find that all the elements of the '550 Patent claims were present in the Cargill installations.  Such a finding depends in part upon the credibility of witnesses, such as Ralph Soles, which is a matter for a jury to determine. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge….")  The same is true with respect to Integra's Powerfill quote in 2009.  (Doc. 254 at 23.)  Defendant's evidence that this prior offer contained all the elements of the '550 Patent claims clearly depends in part upon the credibility of Robert Hesse's testimony.  If a jury were to find that testimony (or the testimony of other witnesses) not credible or insufficiently clear or persuasive to meet Defendant's burden, it could rationally find the Powerfill quote did not contain one or more necessary elements such as a retaining wall, a tightening mechanism, or a board.

3. <u>*Vanmoor* line of cases</u>.  Defendant also argues that "[i]f Raven's current accused Fortress tarps infringe, then Raven's cable pockets necessarily invalidate" the '550 Patent under the axiom that a product "which would literally infringe if later in time anticipates if earlier." (Doc. 254 at 22.) (citing cases.)  Defendant makes a similar argument with respect to the Powerfill cover, which it contends "is nearly identical to Fortress [cover], encompassing each claim element of the '550 Patent."  (*Id.* at 24.)  Defendant asserts that in view of Plaintiff's "broad" infringement allegations, Defendant need only prove the dates of the sales of the foregoing products to invalidate the patent. (Doc. 296 at 2) (citing *Vanmoor,* 201 F.3d 1363).

The problem with Defendant's argument is that the instant case involves a claim of contributory rather than direct infringement. This means Defendant's Fortress internal strap system tarps are not accused, in and of themselves, of infringing the patent. Rather, they are alleged to be a material component of the claimed invention that, "when installed using the standard method known and employed in the industry," infringes the patent. (Doc. 237 at 6.) This distinction appears material to the doctrine of anticipation, which invalidates a patent claim "only if each and every element *of the claim* is expressly or inherently disclosed in a single prior art reference." *Kingston Tech. Co.,* 2020 WL 864876, at *3 (emphasis added). Thus, to show anticipation, Defendant must show that all elements of Claim 8, 9, or 11 (such as a retaining wall, board, et cet.) were present in a single prior art reference. Merely showing that all the elements of the material *component* (i.e. tarp) were the subject of a prior sale or use does not satisfy the test for anticipation. Having said that, the court wants no misunderstanding concerning the scope or effect of this conclusion. There can be no contributory infringement unless (among other things) the material component "has no substantial non-infringing uses." *Koninklijke Philips N.V. v. Zoll Med. Corp.*, 656 F. App'x 504, 522 (Fed. Cir. 2016); 35 U.S.C. § 271(c). If Defendant presents evidence that Fortress internal system tarps, or materially equivalent tarps containing the same elements, were sold prior to the critical date, such facts would appear to give rise to only two possible inferences, both of which suggest invalidity. One possibility is that if Fortress tarps or their equivalent were sold before the critical date and the tarps were installed in an infringing manner, they would then invalidate the '550 Patent claims by prior use. A second possibility is that the same tarps were installed in a non-infringing manner, in which case they would *a fortiori* have non-infringing uses, such that they would invalidate the claims provided the non-infringing use was "substantial." Because this issue was not raised or framed in this manner in the summary

judgment motions, and the parties have not briefed it, the court makes no determination with respect to it at this point. At this point, Defendant has not shown that the '550 Patent is invalid under *Vanmoor*.

4.   <u>Direct infringement and substantial non-infringing uses</u>.   A party is liable for contributory infringement under 35 U.S.C. § 271(c) if: 1) there is direct infringement; 2) the accused infringer had knowledge of the patent; 3) the component has no substantial non-infringing uses; and 4) the component is a material part of the invention.   *Koninklijke Philips N.V.*, 656 F. App'x at 522 (citation omitted.)   Defendant argues Plaintiff has no evidence to support the first or third element.   (Doc. 254 at 24-28.)

Plaintiff has cited evidence that would allow a jury to find direct infringement resulting from installation of Defendant's tarps at facilities identified by Jeffrey Decker.   Decker examined and photographed several facilities and compared what he found at those facilities to the elements of the relevant '550 Patent claims.   Based on his observations, he opined that the installations infringed on the relevant patent claims.   Considering all the direct and circumstantial evidence Plaintiff cites relating to such facilities, a jury could reasonably find that one or more installations contained all the elements of the claims.   Defendant argues the evidence is insufficient in part because Decker conceded he did not check what was stored under the tarps at these sites, and he opined that using the tarps to cover hay would not infringe, but that covering grain would infringe. (Doc. 254 at 25.)   But even assuming hay could not be considered a "bulk material" under the patent, Plaintiff has cited evidence from which a jury could reasonably infer that grain was in fact stored at these facilities. That evidence included pictures showing what appear to be grain storage facilities immediately adjacent to the temporary storage structures. (*See e.g.,* Doc. 265-1 at 72, Doc. 265-2 at 9.)

Defendant also argues Plaintiff cannot establish that the Fortress grain covers have no substantial non-infringing uses. To be sure, Defendant has cited some evidence of non-infringing uses by its customers. It cites invoices and testimony suggesting some customers ordered the covers in order to use them with ground anchors (or "earth augers") rather than with retaining walls. But Defendant points only to a handful of such instances, and a conclusion that these covers were in fact used without walls depends in part on inferences and the credibility of witnesses. Defendant also notes the '550 Patent specification itself asserts (but does not claim) that "the storage system may be used without a retaining wall," in which case "the tarpaulin may be secured to anchors embedded in the ground." (Doc. 254 at 26.) It also states that the system "may be used to store salt, compost, silage, contaminated soil and the like," and Defendant cites evidence that salt would likely be stored without a retaining wall. Defendant has thus cited evidence of non-infringing uses. The problem with Defendant's summary judgment argument is that a non-infringing use must be "substantial" to preclude contributory infringement. 35 U.S.C. § 271(c). "[N]on-infringing uses are substantial when they are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *Toshiba*, 681 F.3d at 1362. In assessing whether a use is substantial, "the fact-finder may consider 'the use's frequency, … the use's practicality, the invention's intended purpose, and the intended market.'" *Id.* (citation omitted.) Plaintiff has cited evidence from which a jury could find that use of the Fortress tarps without a retaining wall occurred only occasionally and that such a use was (according to Jeffrey Decker) impractical and contrary to the intended purpose of internal strap cover systems, because the use of ground anchors instead of a wall made it impractical to get sufficient leverage to tighten down the straps. Because a jury drawing all inferences against Defendant might find the uses were not substantial, Defendant is not entitled to summary judgment on this issue.

5. <u>Recapture of surrendered material</u>.  In an argument that is not entirely clear, Defendant says Plaintiff "is asserting the patent scope in an impermissible way" because it narrowed its claim during prosecution of the '239 Patent and the surrendered scope "cannot be part of the '550 Patent claims."  (Doc. 254 at 28.)  Plaintiff responds that this argument is both procedurally improper (not having been raised in the invalidity contentions) and meritless, to which Defendant states in reply that it "raises this not as an invalidity argument *per se*, but rather because the scope of the '550 patent is narrow like the '239 patent."  (Doc. 296 at 9-10.)

Because Defendant's reply indicates this argument is not meant to assert that the patent is invalid, and the argument does not otherwise request any specific relief, the court denies it insofar as it seeks summary judgment.

6. <u>Willful Infringement</u>.  Plaintiff alleges it is entitled to enhanced damages under 35 U.S.C. § 284 because Defendant's infringement of the '550 Patent was "willful and deliberate." (Doc. 237 at 11.)  Defendant argues it is entitled summary judgment on this issue because the allegation of willfulness is based solely on post-lawsuit conduct (the suit initially alleged infringement only of the now-dismissed '239 Patent) and Plaintiff did not seek a preliminary injunction.   Defendant argues these circumstances preclude willfulness.   (Doc. 254 at 30.) Defendant also argues it has good-faith defenses such that it cannot be found to be acting in bad faith by continuing to sell the challenged Fortress product.

The Supreme Court recently addressed the standards for enhanced damages and stated:

> Awards of enhanced damages under the Patent Act over the past 180 years establish that they are not to be meted out in a typical infringement case, but are instead designed as a "punitive" or "vindictive" sanction for egregious infringement behavior. The sort of conduct warranting enhanced damages has been variously described in our cases as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate. See *supra*, at 1928 – 1930. District courts enjoy discretion in deciding whether to award enhanced damages, and in what amount. But through nearly two centuries of

> discretionary awards and review by appellate tribunals, "the channel of discretion
> ha[s] narrowed," Friendly, Indiscretion About Discretion, 31 Emory L.J. 747, 772
> (1982), so that such damages are generally reserved for egregious cases of culpable
> behavior.

*Halo Elecs., Inc. v. Pulse Elecs., Inc*., 136 S. Ct. 1923, 1932 (2016). Notwithstanding the historical

"narrowing" of discretion, *Halo* rejected a more stringent standard and a "rigid formula" that

would have required evidence of "objective" recklessness and "clear and convincing evidence."

*Id.* Rather, the proper focus is on the infringer's subjective intent, and its culpability is measured

against its knowledge at the time of the challenged conduct. *Id.* at 1933. A preponderance of the

evidence standard governs the determination. *Id.* at 1934.

As Plaintiff points out, the Federal Circuit has held "there is 'no rigid rule' that a patentee

must seek a preliminary injunction in order to seek enhanced damages." *Mentor Graphics Corp.*

*v. EVE-USA, Inc.,* 851 F.3d 1275, 1296 (Fed. Cir. 2017) (citation omitted.) Accordingly,

Defendant is not entitled to summary judgment by virtue of the fact Plaintiff did not seek a

preliminary injunction. But having considered all of the evidence and circumstances cited by the

parties, the court concludes no reasonable fact-finder could conclude Defendant's conduct

constitutes the type of "egregious case" of culpable behavior that warrants increased damages.

Plaintiff does not mention the fact that it brought this suit alleging infringement of the '239 Patent

but subsequently dismissed those claims with prejudice. Plaintiff nevertheless argues any defense

of the claims relating to the '550 Patent is egregious because "Raven's defenses are not made in

good faith." (Doc. 292 at 31.) Defendant's claim of substantial non-infringing uses, however, not

only has substantial evidence that could support a verdict in its favor, but it is bolstered in part by

an allegation of non-infringing use (installation with ground anchors instead of a wall) made by

Plaintiff itself in the '550 Patent. The decision to continue sales of its product and to litigate an

allegation made by Plaintiff is hardly evidence of subjective bad faith. Similarly, Defendant's

assertion of prior art references, including one (Western Ag) not disclosed by Plaintiff until late in the '550 prosecution (and not at all in the '239 prosecution) that drew no specific comment or analysis from the Examiner despite its use of an internal strapping system, does not reasonably give rise to an inference of subjective bad faith or willfulness in the assertion of an invalidity defense. These defenses may or may not ultimately prove persuasive, but their assertion does not rise to the level of egregious conduct that would support an award under the *Halo* standard. Defendant's motion for summary judgment on the issue of willfulness is accordingly granted.

### VI. Conclusion

Plaintiff's motion for summary judgment (Doc. 238) is GRANTED IN PART and DENIED IN PART; the motion is GRANTED as to arguments by Defendant that sales by Plaintiff or sales of the Union Iron system invalidate the '550 Patent under the on-sale bar of § 102; the motion is otherwise DENIED;

Plaintiff's motion to exclude opinions of Dr. Carol Jones regarding non-infringement (Doc. 240) is GRANTED IN PART and DENIED IN PART as stated in this order;

Plaintiff's motion to exclude opinions of Dr. Carol Jones regarding invalidity (Doc. 242) is GRANTED IN PART and DENIED IN PART as stated in this order;

Plaintiff's motion to exclude opinions of Michael Lewis (Doc. 244) is GRANTED IN PART and DENIED IN PART as stated in this order;

Plaintiff's motion to dismiss counterclaim for lack of jurisdiction (Doc. 246) is DENIED;

Defendant's motion to exclude opinions of Jeffrey Decker (Doc. 249) is DENIED;

Defendant's motion to exclude opinions of Antoinette Tease (Doc. 251) is DENIED; and

Defendant's motion for summary judgment (Doc. 253) is GRANTED IN PART and DENIED IN PART; it is GRANTED as to Plaintiff's allegation of willful conduct and increased damages; the motion is otherwise DENIED.

IT IS SO ORDERED this 30th day of April, 2020.


_____s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE