IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


J&M INDUSTRIES, INC.,

        Plaintiff,

v.                                                       Case No. 16-2723-JWB

RAVEN INDUSTRIES, INC.,

        Defendant.


**MEMORANDUM AND ORDER**

This matter is before the court on Raven Industries, Inc.'s ("Raven's") motion for judgment as a matter of law or for new trial (Doc. 374); Raven's motion for a finding of inequitable conduct (Doc. 376); and J&M Industries, Inc.'s ("J&M's") motion for permanent injunction (Doc. 372). The motions are fully briefed and ripe for decision. (Docs. 373, 375, 377, 378, 379, 380, 383, 385, 386.) For the reasons stated herein, Raven's motion for judgment as a matter of law or for new trial is DENIED; Raven's motion for a finding of inequitable conduct is DENIED; and J&M's motion for permanent injunction is GRANTED to the extent stated in this order.

**I. Background**

J&M owns U.S. Patent No. 9,890,550 ("the '550 Patent"), pertaining to a grain storage cover with an internal strapping system. J&M claimed Raven has contributorily infringed on Claims 8, 9, and 11 of the '550 Patent through sales of Raven's Fortress brand internal strapping system. (Doc. 237 at 10.) Raven denied infringement and asserted that the claims of the '550 Patent are invalid because the invention was anticipated and obvious in light of prior art. (*Id.* at

8.)  It further asserted that J&M secured the '550 Patent through inequitable conduct, including by intentionally withholding material prior art from the U.S. Patent Office.  (*Id.* at 16.)

In May 2020, the court ruled on the parties' cross-motions for summary judgment.  (Doc. 298.)  The court essentially denied both parties' motions (with certain exceptions), and the matter proceeded to jury trial in April of 2021.  At the conclusion of the trial, the jury found that Raven had not proved by clear and convincing evidence that any of Claims 8, 9, or 11 of the '550 Patent was invalid; that J&M had proven by a preponderance of evidence that Raven contributorily infringed each of Claims 8, 9, and 11; that J&M was entitled to damages of $727,240.00 for the infringement; and that Raven had not shown by clear and convincing evidence that J&M deliberately failed to disclose material information or made a material misrepresentation to the U.S. Patent Office, with intent to deceive, in J&M's prosecution of the '239 Patent (a prior patent related to the '550 Patent).  (Doc. 351.)

## II.  Raven Motion for Judgment as a Matter of Law or For New Trial (Doc. 374).

Raven renews its prior motion for judgment as a matter of law and argues alternatively that a new trial should be granted.  Raven contends the evidence was insufficient to support the jury's finding of contributory infringement because "the '550 patent itself teaches and describes a substantial non-infringing use of the accused tarp with straps (*i.e.*, a use without a wall)" and "there was ample evidence proving that Raven's product is capable" of a substantial non-infringing use. (Doc. 375 at 7.)  It further argues the evidence established that the accused Raven Fortress product is the same design as the Raven cable pocket product, which existed before J&M filed for patent protection, such that "the asserted patent claims are invalid."  (*Id.* at 2.)  Raven also contends that two evidentiary rulings resulted in prejudice to Raven and warrant a new trial.  First, Raven complains the court precluded Raven from discussing J&M's infringement allegations involving

the '239 Patent.  (*Id.*)  Second, Raven contends it was error to allow J&M witnesses to say they disclosed Western Ag prior art to their patent attorneys after J&M asserted privilege during discovery.  (*Id.*)

### A.  Standards

The Federal Rules of Civil Procedure provide in part:

> If a party has been fully heard on an issue during a trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). In applying this standard, the court must "construe the evidence and inferences most favorably to nonmoving party [*i.e.*, J&M], and refrain from weighing the evidence, passing on the credibility of witnesses, or substituting [its] judgment for that of the jury."  *Cejka v. Vectrus Sys. Corp.*, 823 F. App'x 591, 597 (10th Cir. 2020) (citing *Bannister v. State Farm Mut. Auto. Ins. Co.*, 692 F.3d 1117, 1126 (10th Cir. 2012)).  In ruling on a renewed motion (including one with an alternative request for new trial) after the entry of judgment, the court may allow judgment on the verdict, order a new trial, or direct the entry of judgment as a matter of law.  Fed. R. Civ. P. 50(b).

Rule 59 further provides that after a jury trial, the court may on motion grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court…."  Fed. R. Civ. P. 59(a)(1)(A).  "Such a motion is 'generally not regarded with favor, and is granted only with great caution.'" *Smith v. Cochran*, 182 F. App'x 854, 864 (10th Cir. 2006) (quoting *United States v. Perea*, 458 F.2d 535, 536 (10th Cir. 1972)). "The party seeking to set aside a jury verdict must show either trial error which constitutes prejudicial error or that the verdict was not based on substantial evidence." *Id.* (citing *White v. Conoco, Inc.*, 710 F.2d 1442,

1443 (10th Cir. 1983)). *See also Henning v. Union Pac. R. Co*., 530 F.3d 1206, 1217 (10th Cir. 2008) ("A new trial cannot be granted unless the error was prejudicial and affects the party's substantial rights.")

### B. Analysis

1. <u>Substantial non-infringing uses</u>.

i. <u>Standard</u>.   The court instructed the jury that to prove its claim of contributory infringement, J&M had to show several elements by a preponderance of the evidence, including that Raven's Fortress product "is not … capable of a substantial non-infringing use." (Doc. 357 at 11.)  The instructions explained that an article is capable of a substantial non-infringing use when it "has uses other than as a part or component of the patented infringing system, and those other uses are not occasional, farfetched, impractical, experimental, or hypothetical." (*Id.*)  *See also Toshiba Corp. v. Imation Corp*., 681 F.3d 1358, 1362 (Fed. Cir. 2012).

ii. <u>Application to the evidence</u>.   Raven cites language from the '550 Patent specification stating that the internal strap system "may be used without a retaining wall," in which case "the tarpaulin may be secured to anchors embedded in the ground." (Doc. 375 at 8.)  Raven argues this is "irrefutable proof" of a substantial non-infringing use, given that all of the patent claims at issue require the use of a retaining wall. (*Id.* at 9.)  This argument ignores other evidence at trial, however, such as testimony from J&M witnesses that although J&M believed before testing that the internal strapping system would work without a wall, it later attempted to do so and concluded the system would not work. (Doc. 365 at 287-88, 291-92[1].)  In what amounts to a collateral attack on the credibility of that testimony, Raven recounts how J&M witnesses testified that after making the foregoing discovery, they did not amend the specification to remove the language claiming the

---

[1] Citations to the trial transcript (Docs. 364-68) refer to the page numbers inserted by the court reporter, not to ECF document page numbers.

4

system could be used without a wall because they did not believe they could do so, and it argues their testimony "was false, or misleading at best…." (Doc. 375 at 9-12.)  Raven acknowledges the court instructed the jury that a patent applicant is permitted to delete material from a specification, but Raven calls in the heavy metaphors by claiming "the skunk had [already] been thrown in the jury box" when the evidence was admitted and the instruction "did not unring the bell."  (*Id.* at 11-12.)  The court rejects the suggestion, however, that the instruction was not sufficient to permit the jury to render a verdict unaffected by any possible confusion about the state of the law.  *Cf. Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1372 (Fed. Cir. 2021) (a jury is presumed to follow jury instructions).  Moreover, as noted above this is really an attack on the credibility of testimony by J&M witnesses that they did not believe they could amend the specification.  But on a Rule 50 motion the court must "refrain from weighing the evidence, passing on the credibility of witnesses, or substituting [its] judgment for that of the jury."  *Cejka*, 823 F. App'x at 597.  Assuming the jury found the testimony of these witnesses credible – as it had a right to do – it had a reasonable basis for concluding that, notwithstanding the language in the specification, the use of the internal strapping system without a wall was impractical and therefore not a substantial non-infringing use.

Raven also notes the evidence showed that its Fortress product (as well as J&M's product) was sometimes used without retaining walls to cover "emergency piles" of grain.  Raven further points to evidence that it sold a "special red strap," which was allegedly used by Raven customers to attach the Fortress product to ground anchors without the use of retaining walls.  (Doc. 375 at 13.)  With respect to the latter point, the jury may well have considered this evidence to be lacking in credibility, given the absence of corroboration showing the Fortress product was actually used in a non-infringing manner or that it was used in such a manner on more than an occasional basis. (*See* Doc. 365 at 382-85; Doc. 353 at 249-50 ("Q. And out of all tarp sales, you [Raven] have been

able to locate seven instances that you believe that show that the internal strapping system tarp that Raven manufactures has been used in a non-infringing way? A. That's correct, yes."))  Moreover, J&M presented evidence that using an internal strapping system with ground anchors instead of a wall was rare and did not work due to practical problems such as the anchors or tarp getting buried because of movement in the edge of the grain pile. (*See e.g*., Doc. 365 at 290-92; Doc. 366 at 183-85.)  It also presented evidence that using a tarp with an internal strap system on an emergency pile was impractical because "the straps are of no use" in that situation.  (Doc. 364 at 224.)  As J&M points out in its brief, a jury viewing the evidence in J&M's favor could find that Raven's own manuals directed purchasers to install the Fortress system with a wall; that photos produced of the Fortress system invariably showed it installed with walls; and deposition testimony was introduced stating that in the experience of the witnesses internal strapping systems had always been used with walls, all of which tended to show that the Fortress system was nearly always installed in an infringing manner.  (*See* Doc. 378 at 4-5.)  Against the backdrop of this and other evidence, a reasonable jury could consider evidence that internal strap systems were sometimes used without walls to cover emergency piles of grain or salt or that they could conceivably be used with ground anchors in the absence of a retaining wall, to be examples of "occasional" or "impractical" non-infringing uses that did not qualify as "substantial."

2.  Cable pocket product.  Raven next argues that its cable pocket product (also called the cable lift system or quadrant cover) invalidates the '550 Patent claims because "it predated the priority date of the '550 patent and contained all of the elements of the asserted claims."  (Doc. 375 at 14.)

Claims 8, 9, and 11 of the '550 Patent are all dependent on Claim 1, which describes a storage system for covering a pile of bulk material that includes the following elements: (1) a

retaining wall extending along a storage perimeter; (2) a tarpaulin with a perimeter edge extending over at least a portion of the retaining wall; (3) at least one tunnel integrally bonded to the tarpaulin; (4) a strap provided within the tunnel, with at least one end of the strap extendable beyond at least a portion of the retaining wall; and (5) a board secured to the retaining wall so that a portion of the tarpaulin is located between the board and the retaining wall.  Claim 8 additionally requires (6) a tightening mechanism attached to at least one end of the strap.  Claim 9 includes all of the foregoing plus (7) the tightening mechanism comprises a winch.  Claim 11 includes the elements of Claim 1 plus (8) the strap is freely movable through the tunnel.  J&M contends Raven failed to show by clear and convincing evidence that a cable pocket (or cable lift) product existed before the priority date with the elements identified above as (4), (5), and (7).

Raven cites the testimony of several witnesses in support of its contention that Raven (or Integra, acquired by Raven in 2014) cable pocket systems, including two systems installed in Minnesota in 2008 or 2009, contained all the elements of Claims 8, 9, and 11. (Doc. 375 at 15-19.) But as J&M points out, much of this testimony describing long-gone installations was not only vague, uncorroborated, or based on speculation, but it came from witnesses who had a particular relationship with Raven or an interest in invalidating J&M's patent, factors the jury could reasonably consider in deciding whether to credit their testimony.  As the court instructed the jury:

> You are the sole judges of the credibility or "believability" of each witness and the weight to be given to his or her testimony.  In weighing the testimony of a witness, you should consider the witness's relationship to Plaintiff or Defendant; any interest the witness may have in the outcome of the case; the witness's manner while testifying; the opportunity to observe or acquire knowledge concerning the facts about which the witness testified; the witness's candor, fairness and intelligence; the extent to which the witness has been supported or contradicted by other credible evidence; and evidence that on some other occasion the witness testified or acted in a manner inconsistent with the testimony the witness gave in this case.  You may, in short, accept or reject the testimony of any witness in whole or in part.

(Doc. 357 at 38.)  In light of this standard, and in light of the jury's undisputed right not to credit such testimony, Raven fails to demonstrate why a reasonable jury could not have concluded that Raven failed to show by clear and convincing evidence that all the elements of Claims 8, 9, and/or 11 were used in cable pocket installations before the priority date.  Only by substituting its judgment for that of the jury on matters of credibility could the court say the jury's verdict was unreasonable in light of the evidence.  *See Cejka*, 823 F. App'x at 597 (a court may not weigh credibility of the witnesses or substitute its judgment for that of the jury on a Rule 50 motion.)

In addition to the foregoing, J&M accurately points out that Raven's evidence failed to credibly show the cable lift system simultaneously included all the elements of the '550 claims. (Doc. 378 at 10.)  For example, Raven relies on the testimony of Ralph Soles, but Soles acknowledged he did not know if the cables on the cable lift system – which were used to lift a center ring in the tarp so the storage area could be filled with grain – were removed from the winch before the tarp was battened down to a wall.  (*See* Doc. 378-2 at 44.)  Similarly, Raven relies on testimony of Robert Hesse, but he could not confirm having actually seen the cables in a cable lift system attached to a tightening mechanism, speculating that the end of the cable "[w]ould have been [attached] down at the base" and either "over the wall or between cracks in the wall or something … somewhere dead anchored down at the bottom."  (Doc. 378-3 at 31.)  Along the same lines, a jury considering the testimony of Donald Gaudet could conclude that it shows the elements of the '550 claims were not simultaneously present in the cable lift system, because Gaudet said "[y]ou have to disconnect the cable system and attach [the tarp] to the wall" with a board "once you disconnect the cable lift system," and that he had never seen the cable system reattached after the tarp was secured with a board.  (Doc. 365 at 337.)   Considering all of the evidence, a reasonable jury could conclude that Raven failed to meet its burden of showing the

invalidity of the '550 Patent claim by clear and convincing evidence.  *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007) ("Since we must presume a patent valid, the patent challenger bears the burden of proving the factual elements of invalidity by clear and convincing evidence.")

    4.  <u>Evidence regarding the '239 Patent</u>.  Raven next argues it is entitled to a new trial because "Raven was precluded from discussing the full events surrounding the '239 patent and J&M's earlier assertions in this case related to it."  (Doc. 375 at 22.)  Raven contends its "inability to present the full story to the jury to negate J&M's inferences of copying including J&M's baseless allegations of infringement of the '239 patent unfairly prejudiced Raven."  (*Id.* at 23.)

    This argument is unpersuasive.  Raven's argument suffers from a lack of specificity, as it generally complains about not being able to "discuss the full events" surrounding the '239 Patent but does not point to any contemporaneous objection Raven made to the introduction or exclusion of any particular evidence, or to arguments made in support thereof, or to a specific ruling made by the court in response to the objection.  The only specific ruling Raven cites was a finding by the court during opening statements that J&M's counsel had not "opened the door" to evidence about infringement of the '239 Patent.  (Doc. 375 at 24) (citing Doc. 364 at 177-78.)  The court rejected Raven's assertion but added, "if it comes up in the evidence, then I think that is an issue and it may be addressed."  (*Id.* at 178.)  Of course, as the court later instructed the jury, "lawyers' statements and arguments are not evidence" in the case.  (Doc. 357 at 41.)  Any stray comment by J&M's counsel in opening statements clearly does not warrant a new trial.  And Raven otherwise makes no showing of an error that likely affected the outcome of the trial.  Raven had a fair opportunity to present its side of the case to the jury.  *See McDonough Power Equip., Inc. v.*

*Greenwood,* 464 U.S. 548, 553 (1984) ("'[A litigant] is entitled to a fair trial but not a perfect one,' for there are no perfect trials.")

5. <u>Attorney-client privilege</u>.   Raven's last argument for a new trial is that the court erred by allowing Aaron Gummer and Donald Gaudet, the inventors of the '550 Patent, to testify that they informed J&M's patent attorneys about Western Ag prior art, because in discovery J&M asserted attorney-client privilege as to communications between the inventors and the patent attorneys.  (Doc. 375 at 25.)  Raven argues this allowed J&M to improperly use the privilege as both as a "shield and sword," and that it resulted in prejudice because it "allowed the jury to incorrectly conclude that J&M discharged its duty of candor by allegedly telling the patent attorneys about the Western Ag prior art…." (*Id.* at 26, 28.)  Raven argues this "was a critical factor in the jury finding for J&M both on invalidity and its advisory finding on inequitable conduct, perhaps the most critical development at the trial." (*Id.* at 26.)

It is well-established that a party may not assert the attorney-client privilege to foreclose discovery on a matter and then use the privilege "as a sword" to defeat or prevail on a claim.  *See e.g., S.E.C. v. McNaul*, 277 F.R.D. 439, 444 (D. Kan. 2011).  Raven's unsupported assertion that this particular issue was "critical" to the jury's findings is unpersuasive, which is reason enough to deny the motion for new trial.  But beyond that, Raven's failure to pursue the matter in discovery, when it could have sought a ruling from the court relating to any question of attorney-client privilege regarding disclosure of Western Ag warrants denial of Raven's motion for new trial.

Raven explored the Western Ag disclosure issue in Aaron Gummer's deposition.  It could have also sought evidence about that disclosure from J&M's patent attorneys.  At the in limine hearing, when Raven argued J&M was improperly attempting to use the attorney-client privilege

as a sword because its privilege log included communications between Aaron Gummer and J&M's

patent attorneys, the court inquired:

> What did you do about it? Did you go through that with opposing counsel and try to get some confirmation that there was or was not anything in it? Did you ask the magistrate judge to review these matters in camera and determine if there was anything in there related to what you're specifically looking for? I mean, I think those are the things that would have been appropriate to ferret this out before this stage of the proceedings.

(Doc. 371 at 44.)  Raven conceded it did nothing to pursue the matter in discovery and, by way of

explanation, offered only that "discovery [was] ending at that time…."  (*Id.* at 44-45.)  Having

made no effort prior to trial to obtain evidence Raven now argues was "critical" to the trial, Raven

is in no position to argue that fundamental fairness requires a new trial.   The court concludes the

motion for new trial should be denied.

### III.  Raven Motion for Finding of Inequitable Conduct (Doc. 376.)

Raven claimed J&M obtained the '239 Patent and '550 Patent through inequitable conduct

because it "intentionally withheld material prior art [i.e., Western Ag] from the U.S. Patent Office

during prosecution of the '239 patent with the specific intent to deceive the Patent Office."  (Doc.

237 at 8.)  Raven contends this conduct invalidates the '550 Patent because, as a continuation

patent, it is part of the same "family" as the '239 Patent.  (*Id.*)  At trial, Raven further argued that

J&M affirmatively misrepresented Western Ag prior art during an appeal of the Patent Examiner's

rejection of a claim.  (*See* Doc. 355 at 858.)

The court submitted the inequitable conduct issues to the jury for an advisory verdict.  The

jury found Raven had not shown by clear and convincing evidence that J&M deliberately made a

material misrepresentation or failed to disclose material information with the specific intent to

deceive the PTO.  (Doc. 351 at 3.)  The Federal Circuit has stated that inequitable conduct "is

equitable in nature, with no right to a jury [trial], and the trial court has the obligation to resolve

the underlying facts of materiality and intent." *See Am. Calcar, Inc. v. Am. Honda Motor Co., Inc.,* 651 F.3d 1318, 1333-34 (Fed. Cir. 2011).   Although this approach potentially implicates Seventh Amendment concerns about the right to have a jury determine facts common to both equitable and legal claims, in this instance the court has no such concerns because it agrees with the jury's determination that Raven failed to meet its burden of proof on the inequitable conduct defense, and the court so holds to the extent it has an obligation to independently determine the inequitable conduct issue.[2]

### A. Standards

"Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent." *Therasence Inc. v. Becton, Dickinson, and Co.,* 649 F.3d 1276, 1285 (Fed. Cir. 2011) (en banc). Based on *Therasence,* the jury was instructed that to establish inequitable conduct, Raven had to prove the following essential elements by clear and convincing evidence: First, that J&M deliberately withheld material information from the PTO or deliberately misrepresented a material fact during the examination of the patent; and Second, that J&M did so with the specific intent to deceive the Patent Examiner into issuing the patent.[3]   (Doc. 357 at 34-35.)   Withheld information is material "if the PTO would not have allowed the claim had it been aware of the withheld information," and a misrepresentation is material "when it convinces the PTO to allow a claim that it would not have allowed if the statement had not been made."   (*Id.* at 35.)   An intent to deceive can be shown through direct or circumstantial evidence, but under

---

[2] Prior to trial, Raven argued the Seventh Amendment required the court to submit the inequitable conduct issues to a jury due to a substantial overlap in evidence and facts between the invalidity claim and the inequitable conduct defense. (Doc. 327 at 6.)

[3] The jury was also instructed on curing inequitable conduct based on J&M's assertion that it cured any failure to disclose Western Ag in the prosecution of the '239 Patent by properly disclosing it in the prosecution of the '550 Patent.

*Therasence* it can only be inferred "where it is the single most reasonable inference that can be drawn from the evidence." (*Id.*)

## B. Findings

The court concludes Raven has failed to satisfy its burden of showing that J&M deliberately withheld Western Ag prior art from the PTO or made misrepresentations with the specific intent to deceive the Patent Examiner into issuing either the '239 or the '550 Patent.  In brief, the court notes that Aaron Gummer testified about how he developed an internal strap tarp system and how he and J&M's owners, Maurice and Donald Gaudet, thought it was novel and unique.  (Doc. 366 at 586.)  After the Gaudets decided to seek a patent, they contacted counsel out of Florida to handle the patenting process.  (*Id.*)  Donald Gaudet corresponded with the patent attorney.  The attorney was authorized to communicate with the PTO on J&M's behalf and, with one or two exceptions, it was the attorney who communicated with the PTO during the patent prosecution.  (Doc. 353 at 176-77.)  This was Gummer's first experience seeking a patent.  Gummer participated in some conference calls with the attorney and answered any questions he was asked.  In his testimony, Gummer acknowledged that prior to obtaining patent protection, he and Donald Gaudet (hereinafter "Gaudet") had discussed, among other things, whether Western Ag prior art, which was known to Gummer from prior experience, posed an obstacle to patent protection.

Gummer testified the patent attorney discussed the duty to disclose prior art and, according to Gummer, he told the attorney about Western Ag hay tarps with pocket straps that he had previously seen.  (*Id.* at 589-90, 592, 641.)  Gaudet testified that he understood from the litigation that Gummer had disclosed the Western Ag information to the patent attorney, although Gaudet said did not recall one way or the other, and he further testified he did not know whether the

attorney had disclosed it to the PTO.  (Doc. 353 at 186.)  Despite Gummer's testimony that he disclosed Western Ag information to the patent attorney, that information was not included in disclosures made to the PTO during prosecution of the '239 Patent. Gummer testified he was "extremely novice" and did not "know all the details with the process," but said as far as he knew they "followed the rules completely all the way through."  (Doc. 366 at 657.)  He said that as far as he knew, they provided whatever information was required, including other instances of prior art.  (*Id.* at 592-93.)

In the instant litigation, Raven included Western Ag hay tarps in its invalidity contentions relating to the '239 Patent.  J&M, in turn, subsequently disclosed that information to the PTO in an Information Disclosure Statement, or "IDS," during J&M's prosecution of the '550 Patent.  At trial, J&M presented evidence that an applicant has until payment of the patent issuance fee to file an IDS, meaning the IDS that listed Western Ag as prior art was timely filed.  (Doc. 353 at 337-38, 356.)  J&M also presented evidence that a Patent Examiner is obligated to consider each reference in an IDS or to specifically note when a listed reference is not considered, and that the notations of Examiner in this instance indicated that all references in the IDS had been considered in the decision to allow the '550 claims.  (*Id*. at 352-53, 355-56.)

Raven complains that Gummer's testimony of having told the patent attorney about Western Ag was "self-serving" and that J&M "did not produce any proof or corroboration" of it. (Doc. 377 at 8-9.)  Ultimately, however, Raven fails to clearly show the testimony was not credible. A great deal of testimony is "self-serving," but that does not necessarily render it unworthy of belief. Moreover, Raven's complaint that J&M has not corroborated the testimony reverses the burden of proof on inequitable conduct, which is on Raven, not J&M.  *See Therasense,* 649 F.3d at 1291 ("Because the party alleging inequitable conduct bears the burden of proof, the 'patentee

need not offer any good faith explanation unless the accused infringer first … prove[s] a threshold level of intent to deceive by clear and convincing evidence.'")  The evidence that Gummer informed J&M's patent attorney about Western Ag was not refuted, notwithstanding Raven's attempts to undermine it by declaring Gummer not credible and by stacking inference upon inference.[4]  As far as the court – and apparently the jury – is concerned, the evidence indicated Gummer told J&M's patent attorney about Western Ag tarps with the expectation the attorney would submit it to the PTO if he thought J&M was legally required to do so.  For reasons not shown by the evidence, the attorney did not disclose it during the '239 Patent prosecution.  Raven argues that even if this is true, J&M's "primary argument … that it discharged its duty of candor" is "wrong as a matter of law" because the duty of candor extends to an applicant's representatives. (Doc. 386 at 1.)  Otherwise, Raven argues, "the duty of candor would be rendered meaningless, and every unscrupulous applicant could use patent counsel as a shield to hide material prior art from the PTO."  (*Id.*)  But whether J&M properly discharged its duty is not quite the same question as whether any J&M representative – including Gummer, Gaudet, or the patent attorney – knowingly withheld the Western Ag prior art with the specific intent to deceive the PTO.  Raven failed to show that any J&M representative had such an intent.[5]

---

[4] *See e.g.,* Doc. 386 at 4 ("[I]t is safe to assume patent counsel did not know about Western Ag, or they would have disclosed it early in the process.  Which leads to one and only one inescapable conclusion: Mr. Gummer lied under oath about telling patent counsel about Western Ag.")  *See also id*. ("The only evidence J&M offered that it told the patent attorneys about Western Ag is that Mr. Gummer said so.  It would not be first time someone accused of fraud said they did not do it. … The accused inventor's mere uncorroborated denial of wrongdoing cannot be sufficient to defeat inequitable conduct."); Doc. 377 at 6 ("They knew Western Ag was a conflict, but they know they need the new product, they had nothing else, and the boss wanted it.  So what do they do? They file for a patent and bury the Western Ag prior art.  That was their only chance to get the patent the boss wanted.  The pattern of intent to deceive began.")

[5] Raven asserts "[i]t is axiomatic that an applicant cannot discharge its duty of candor to the PTO by telling patent counsel about material prior art if patent counsel then withholds that material prior art from the PTO."  (Doc. 386 at 1.)  Raven does not cite any authority for this axiom, nor does it discuss how the element of intent to deceive applies to such a scenario.

The attorney's non-disclosure could have resulted from simple inadvertence or from a determination – correct or not – that the Western Ag information was not material and did not need to be disclosed. And while it is not beyond the realm of possibility that it could have been done in an effort to deceive the PTO, such a conclusion would be pure speculation on this record. There is no clear, credible evidence that anyone, including J&M's patent attorney, knowingly failed to disclose Western Ag or misrepresented it for the purpose of deceiving the PTO. *Cf. Therasense*, 649 F.3d at 1290 ("A finding that the misrepresentation or omission amounts to gross negligence or negligence under a 'should have known' standard does not satisfy this intent requirement.") Raven essentially ignores the intent-to-deceive requirement by suggesting "the only issue is whether it was Mr. Gummer or patent counsel who made the decision not to tell the PTO, but *both* result in inequitable conduct." (Doc. 386 at 4.)  In *Therasense,* the Federal Circuit specifically raised the standard for proving inequitable conduct because the doctrine "has plagued not only the courts but also the entire patent system" with allegations "routinely brought on 'the slenderest grounds.'" *Therasense*, 649 F.3d at 1289.  The low standards previously applied led patent prosecutors to "regularly bury PTO examiners with a deluge of prior art references" out of "fear that to do otherwise risks a claim of inequitable conduct." *Id.*  The Federal Circuit has now made clear that to prevail on such a claim, the party asserting it "must prove that the patentee acted with the specific intent to deceive the PTO." *Id.* at 1290.

As the court already noted, Raven could have pursued this line of inquiry in discovery – including by seeking to depose J&M's patent attorney – and in doing so could have clearly shown why the Western Ag information was not disclosed to the PTO sooner. *Cf. Hay & Forage Indus. v. Ford New Holland, Inc.*, 132 F.R.D. 687, 690 (D. Kan. 1990) (where defendant alleged inequitable conduct, court allowed deposition of plaintiff's attorney who allegedly submitted false

16

or misleading information to the PTO; the attorney was "the best and perhaps the only available source for much of the information sought.")  Raven repeatedly suggests it could not have done so because the information was privileged, but it does not address the likelihood that had Raven specifically requested information about the Western Ag disclosure and sought to compel it, any claim of privilege on that point would have been found to have been waived.  *See e.g., In re VISX, Inc.*, 18 F. App'x 821, 823 (Fed. Cir. 2001) (patent applicant impliedly waived its attorney-client privilege by filing an IDS with the PTO).  Of course, the point is now moot, as Raven never made a concerted effort to obtain this "critical" information.  Raven nevertheless argues that the patent attorney's failure to disclose Western Ag in the '239 Patent prosecution clearly shows an intent to deceive the PTO.  That argument is speculative and unconvincing.

Likewise unconvincing is Raven's contention that "J&M lied to the PTO by filing a reply brief and supporting declaration saying no one else had done this type of covering on a large-scale." (Doc. 377 at 2.)  In Raven's retelling, J&M must have had Western Ag specifically in mind whenever it represented to the PTO that its invention was distinct from prior art consisting of small tarps or tarps without parallel tunnels or pockets and the like.  But it is equally likely that, due to inadvertence or oversight, J&M simply failed to include or consider Western Ag.

In reaching this conclusion the court has considered Raven's various arguments about the materiality of Western Ag prior art to issuance of the '239 Patent.  Raven contends "no prior art could be more material than the Western Ag prior art" and asserts three arguments in support thereof: (1) Gummer and Gaudet discussed whether Western Ag would pose a conflict to getting a patent; (2) "the original claims J&M tried to patent" were identical to Western Ag; and (3) J&M recently sent Western Ag a cease-and-desist letter accusing it of infringing the '550 Patent.  (Doc. 377 at 7.)   The first argument does not prove the Western Ag prior art was material; it shows only

that Gummer and Gaudet discussed whether it might be material.  The second argument misapplies materiality, which in this context refers only to withheld information that caused the PTO to disallow a claim or to misrepresented information that caused the PTO to allow a claim.  It does not apply to claims that never became part of the patent, such as "the original claims J&M tried to patent."  *See Therasense,* 649 F.3d at 1292 ("enforcement of an otherwise valid patent does not injure the public merely because of misconduct, lurking somewhere in patent prosecution, that was immaterial to the patent's issuance.")  Raven also argues that J&M overcame various Examiner rejections in the '239 prosecution by failing to disclose Western Ag.  But Raven's assertions are speculative and fail to address how claim elements that are apparently missing from Western Ag (such as a retaining wall and a board secured to the wall) would have impacted the Examiner's analysis.  The court also notes the Examiner on the '550 Patent allowed claims similar to the '239 Patent despite the disclosure of Western Ag in the '550 prosecution.  Finally, Raven's argument pertaining to a June 2021 cease-and-desist letter from J&M to Western Ag does not prove materiality.  It is not even clear from the materials cited what type of product or installation the cease-and-desist letter concerns.   (*See* Doc. 377-3.)

Ultimately, the court need not determine whether Western Ag prior art was material, as Raven has failed to meet its burden of showing J&M's intent to deceive, and "[i]ntent and materiality are separate requirements." *Therasense,* 649 F.3d at 1290.  As the forgoing discussion indicates, however, insofar as Raven contends the materiality of Western Ag constitutes evidence of or lends credence to J&M's intent to deceive, the court believes Raven has exaggerated the significance of Western Ag.  Raven has failed to show that Western Ag tarps posed such an

obstacle to J&M's claims that the failure to disclose it earlier somehow indicates an intent to deceive the PTO.[6]

With respect to J&M's actions in the prosecution of the '550 Patent, Raven concedes J&M disclosed Western Ag hay tarps before issuance of the '550 Patent, although it accuses J&M of having waited "until nearly the end" of the prosecution and of "burying" the disclosure in a 146-page IDS. (Doc. 377 at 3.) Raven also complains that J&M "hired Ms. Tease [a patent process expert] to … give the false impression [at trial] that the Examiner considered Western Ag drawings as part of the '550 prosecution" when J&M allegedly "knew the drawings attached to Raven's invalidity contentions were *not* Western Ag drawings."[7] (*Id.* at 4.) Raven theorizes that J&M slyly slipped references to Western Ag in the IDS because it "wanted to be able to argue at trial that Western Ag prior art was before the PTO, but J&M did not want Western Ag actually examined." (*Id.*) Raven's theory that J&M not only intended to but succeeded in duping the PTO by making a stealthy disclosure of Western Ag relies upon a mountain of conjecture and unjustified inferences. It also fails to adequately address contrary inferences. For example, Raven suggests

---

[6] *Therasense* emphasized the separate nature of intent and materiality. Among other things it said a district court should not use a "sliding scale" that finds a weak showing of intent sufficient when there is a strong showing of materiality, and vice versa. *Therasense,* 649 F.3d at 1290. Further, a district court "may not infer intent solely from materiality" and "must weigh the evidence of intent to deceive independent[ly] of its analysis of materiality." *Id.* The court added: "Proving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive." *Id.*

[7] Raven included these drawings in its '239 invalidity contentions and represented them to be Western Ag hay tarp drawings. J&M then included the drawings in its IDS filed with the PTO, likewise identifying them as Western Ag drawings. Raven notes that in 2019 (after issuance of the '550 Patent), Richard Carter of Western Ag was deposed and was asked about the drawings. He said they were "not … specifically our [Western Ag] design" because they included a pipe and "we never used a pipe." (Doc. 377-12 at 3.) Carter said the drawings were not a Western Ag document, although he could not say whose they were, and he noted the drawings had similarities to Western Ag's hay tarp design. (*Id.*) Carter also testified (via Zoom) at trial. As the foregoing indicates, evidence establishing the source of these drawings was less than clear. At the same time, it appears undisputed that the drawings were similar to a Western Ag hay tarp design. Against this murky background, Raven now accuses J&M of having lied to Ms. Tease or allowing her to knowingly lie because she was allegedly not told that these were not Western Ag drawings. Raven further accuses J&M's counsel of asking a question at trial "designed to mislead the jury into believing Western Ag drawings were before the PTO, when they were not." (Doc. 377 at 23.) The court notes that Carter arguably had an interest adverse to J&M in this matter, and that neither J&M nor the jury was obligated to accept as true Carter's assertion that the drawings were not Western Ag's. Regardless, Raven's accusations are unpersuasive and are perhaps indicative of Raven's exceedingly low threshold for inferring intent to deceive.

the disclosure of Western Ag in the IDS was concocted by J&M to fool the PTO, but evidence indicated J&M essentially copied this information from Raven's own invalidity contentions (regarding the '239 Patent) and included it in the IDS.  Likewise, Raven's elaborate theory of how the Patent Examiner did not really consider the Western Ag prior art, or did not do so before allowing the '550 Patent claims, fails to refute evidence that the Examiner's notations indicate Western Ag was in fact considered along with the other IDS references in the Examiner's decision to allow the claims.

Raven could be right that J&M should have disclosed Western Ag in the '239 Patent prosecution.  J&M may have even been negligent in failing to do so.  But "to meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Therasense,* 649 F.3d at 1290 (citation omitted.) "Indeed, the evidence 'must be sufficient to *require* a finding of deceitful intent in light of all the circumstances.'" *Id.* (emphasis in original.)  Such a finding is not required on this record.  In the final analysis, Raven's inequitable conduct defense is unsupported by clear evidence that J&M intended to deceive the PTO.  Raven's motion for a finding of inequitable conduct is accordingly denied.

### IV. J&M's Motion for Permanent Injunction (Doc. 372).

J&M moves for an order permanently enjoining Raven from further activities that infringe claims 8, 9, or 11 of the '550 Patent, including making, offering to sell, or selling Raven's Fortress product in the United States.  (Docs. 372, 373.)  Raven opposes the motion for a number of reasons. (Doc. 380.)  In addition to the evidence presented at trial, both parties have submitted additional exhibits with their briefs.  Neither party has requested further hearing or an additional opportunity

to present evidence concerning the request for an injunction, and the court concludes no further hearing is necessary.

### A.  Standards

The Patent Act provides in part that a federal district court "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."  35 U.S.C. § 283.  The traditional four-factor test applied by courts of equity when considering whether to award permanent injunctive relief applies to disputes under the Patent Act.  *eBay Inc. v. MercExchange, LLC,* 547 U.S. 388, 391 (2006).  That test requires a plaintiff to demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  *Id.* Although the Patent Act grants a patent holder the right "to exclude others from making, using, offering for sale, or selling the invention," that does not alter the discretionary nature of the injunctive remedy authorized by § 283.  *Id.* at 392 (quoting 35 U.S.C. § 154(a)(1)). The decision whether to grant or deny injunctive relief for infringement of a patent remains within the equitable discretion of the court, to be exercised consistent with the four-part test described above.  *Id.* at 394.

### B.  Analysis

1.  <u>Irreparable injury</u>.  The evidence shows J&M and Raven are direct competitors in the sale of internal strapping systems in grain storage covers and that these two companies dominate the market for such covers.  Furthermore, J&M has shown that Raven's sales of its Fortress brand products has negatively impacted J&M's sales and market share and will do so in the future if

Raven is allowed to continue to sell its Fortress product. J&M cites testimony establishing both the head-to-head competition between the parties in this market and the absence of other competitors in the same field. (*See* Doc. 373 at 3-4) (citing evidence including a Raven witness acknowledging he was "not aware of others" in the industry selling grain covers with internal strapping systems).[8] It also cites evidence that the parties previously bid to sell their products to Cargill, one of the largest purchasers of temporary grain storage systems, and that Cargill used to divide its purchases between the parties at various sites. In 2019, however, Cargill awarded a three-year contract to Raven, including for internal strapping system covers, with the contract covering all of Cargill's locations and all grain covers. (Doc. 373-2 at 2.) *See TEK Global, S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 793 (Fed. Cir. 2019) ("Head-to-head competition and lost market share tend to evidence irreparable harm.") J&M also cites evidence that after Raven (and Integra) began selling internal strapping systems for grain covers, J&M was forced to lower its price to compete with Raven. (*Id.*)

In addition to such evidence of lost opportunities and price erosion, J&M has cited evidence that it is difficult to identify the manufacturer of an internal strapping system by looking at it, which would likely make it difficult for J&M to police infringement of the '550 Patent. (*See* Doc. 373 at 5-6.) J&M also cites circumstantial evidence that its reputation for innovation in the field was preempted, and thereby damaged, due to sales of infringing products by Integra before J&M was able to effectively present its invention at a significant industry gathering. (Doc. 373 at 7; Doc. 373-2 at 3.) Evidence also shows that J&M has sought to retain the goodwill that it has

---

[8] Raven's brief states that the parties control about 80% of the market. (Doc. 380 at 6.) But that figure – as high as it is – appears to concern the market for *all* temporary grain storage systems, not just those with internal strapping systems. At trial, evidence indicated that Raven and J&M are the only current known suppliers of temporary grain storage covers with the internal strapping system.

accrued from sales of its invention.  It has never granted a license to an unaffiliated company and represents that it has no intention of licensing the '550 Patent in the future.  (Doc. 373-2 at 3.)

Under Federal Circuit precedent, "[p]rice erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." *Aria Diagnostics, Inc. v. Sequenom, Inc*., 726 F.3d 1296, 1304 (Fed. Cir. 2013) (quoting *Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed.Cir.2012)).  The court finds J&M has made a sufficient showing of irreparable harm from Raven's continued sales of Fortress products such that this factor weighs in favor of granting the requested injunction.  There is a strong likelihood that if sales of infringing Fortress products continue, such sales will cause J&M to suffer continued loss of market share, loss of business opportunities, price erosion, and damage to J&M's goodwill. J&M has also shown a strong causal connection between infringement by Raven and the harm outlined above.  *See Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, 967 F.3d 1353, 1377-78 (Fed. Cir. 2020) (patentee must show it will suffer irreparable harm and that a sufficiently strong causal connection relates the alleged harm to the infringement).  Evidence at trial established that the infringing internal strap system in the Fortress product drives consumer demand for that product, and that such demand has resulted, and will continue to result, in the harm described above.  If the internal strapping system did not drive demand, common sense dictates that customers would simply purchase covers without that system, which according to the evidence are significantly cheaper.[9]

Raven argues, among other things, that J&M's failure to seek an injunction before now shows it did not really suffer irreparable harm.  (Doc. 380 at 12.)  "Delay is a factor in evaluating irreparable harm." *Cordis Corp. v. Boston Scientific Corp.*, 99 F. App'x 928, 934 (Fed. Cir. 2004).

---

[9] Raven's brief states that 90% of its sales of temporary storage grain tarps "already go to the less expensive, non-internal strapping system."  (Doc. 380 at 14.)

But the court finds no unreasonable delay here in J&M's failure to seek a preliminary injunction or injunctive relief immediately upon obtaining a verdict of infringement.   J&M's litigation conduct does not reasonably imply a concession that it has not suffered irreparable harm.  To the contrary, the evidence supports J&M's contention that it has suffered such harm.

2. Whether monetary damages are inadequate.  The nature of the harm likely to result from continued infringement weighs in favor of a finding that monetary damages would not be adequate to compensate J&M for continued infringement by Raven.  Harm such as loss of market share and goodwill of the sort J&M has shown are "particularly difficult to quantify," and "[d]ifficulty in estimating monetary damages is evidence that remedies at law are inadequate." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010).  Moreover, this conclusion is bolstered by the fact that J&M has never licensed the '550 Patent to a non-affiliated company and maintains that it will not do so.

3. Balance of hardships.  "In considering the balance of hardships, courts may consider the 'parties' sizes, products, and revenue sources.'" *Bio-Rad Labs., Inc.,* 967 F.3d at 1378 (citation omitted.)  Evidence showed that J&M is a significantly smaller company than Raven and that its revenue is far more dependent than Raven's on its ability to sell internal strap system covers of a type covered by the '550 Patent.  Raven is a multi-division company with diverse products and over 1300 employees.  (Doc. 373 at 11.)  Raven's sales of infringing products, according to evidence cited by J&M, accounted for less than one percent of Raven's revenues in 2019.  (*Id.*) The court finds J&M has met its burden of showing that the balance of hardships favors J&M.

4. Public interest.  "[T]he touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects." *Bio-Rad Labs., Inc*., 967 F.3d at 1379

(quoting *i4i Ltd. P'ship*, 598 F.3d at 863).  The requested injunction in this case furthers a public interest by upholding J&M's patent rights.  Raven seeks to overcome this interest by positing that "there could be a risk to the food supply if a significant supplier is removed from the market, and there are not enough grain covers to go around…."  (Doc. 380 at 17.)  Although such a state of affairs would undoubtedly weigh strongly against the requested injunction, the assertion itself appears wholly speculative and contrary to the evidence.  Aside from the fact that the requested injunction should have no effect on the production of grain covers that do not use the internal strapping system, J&M cites evidence that it has the capacity to supply the market with internal strap covers going forward.  (Doc. 373 at 12.)  Raven criticizes that evidence as "self-serving," but it does produce any evidence of its own to overcome it.

In sum, all of the foregoing factors weigh on balance toward issuance of a permanent injunction in favor of J&M.  J&M has made a sufficient showing of irreparable harm, that it has no adequate remedy at law, that the balance of hardships weighs in its favor, and that the public interest weighs in favor of enjoining Raven from engaging in future infringing sales of its Fortress product.  The court accordingly finds J&M's motion for a permanent injunction should be granted.

5.  <u>Scope of the injunction</u>.  Raven objects that the injunction proposed by J&M is overbroad because it seeks to enjoin all sales of Fortress products, despite the fact that "a customer can use the Fortress product without a wall, by securing it to the ground."  (Doc. 380 at 17.)  Raven notes such a use does not infringe the '550 Patent because the claims require the use of a retaining wall.  (*Id.*)  Raven argues any injunction that barred such uses would be overbroad and impose an unnecessary restraint on lawful conduct.  It argues that if the court determines that an equitable remedy is warranted, the court should instead require Raven to pay a continuing royalty on future sales.  (*Id.* at 19.)

The court has already outlined why damages are not an adequate remedy for future infringement. That same conclusion applies to Raven's suggestion of a mandated a royalty on Raven's future sales instead of an injunction. On the evidence presented J&M is entitled to injunctive relief to prevent the irreparable harm it will suffer from future infringement. Additionally, the court concludes Raven's objection to the proposed injunction as overbroad should be denied. The jury's finding that Raven contributorily infringed the '550 Patent necessarily determined that Raven's Fortress products have no substantial non-infringing uses. Raven nevertheless argues an injunction cannot prohibit all sales by Raven because "if a customer wants to use the Raven Fortress without a wall, there is no legal or factual bar to that." (Doc. 380 at 18.) But such a hypothetical use does not warrant an alteration in the proposed injunction. The verdict not only necessarily found such uses to be non-substantial, it also necessarily found that "Raven knew that its Fortress product was especially made or adapted for use in an infringing system." (Doc. 357 at 11.) The court notes that Raven offers no alternative language under which the injunction would effectively prohibit all infringing sales but identify and exempt only non-infringing uses. In light of Raven's knowledge that its product was made or adapted for use in infringing systems – and in light of the impracticality of further tailoring the injunction to exempt non-infringing uses – the court concludes it is appropriate to enjoin Raven from engaging in all sales of Fortress products.

The court nevertheless finds that two alterations in the proposed injunction are appropriate. First, the court will add language to clarify that the injunction only applies to conduct from the date of the injunction going forward. No prior sales and no current uses by customers arising from purchases made before the date of the injunction will be impacted by the injunction. Accordingly, in the second full paragraph of the proposed injunction, the court will add the following:

Line 3: add "beginning from the date of this order" just after the phrase "enjoined and restrained."

Second, the court will eliminate language in the proposed injunction that could create confusion among purchasers or current users of Fortress products concerning their potential liability with respect to the injunction. As written, the proposed injunction applies not only to Raven and its agents, but also to "those persons in active concert or participation with any of them." The term "active concert or participation" is sufficiently vague that anyone using a Fortress product could reasonably fear violating the injunction. Although J&M has shown a need to enjoin Raven from making, selling, or distributing Fortress products, it has not shown a need to enjoin customers or others not directly tied to Raven from using Fortress products. Absent a showing by J&M that a restraint on Raven "making, offering to sell, providing or distributing in the United States, or importing into the United States products that infringe the '550 Patent" is insufficient to protect J&M from irreparable harm, the scope of the injunction will be limited accordingly. The court will therefore remove the following from the second full paragraph of the proposed injunction:

Lines 1 and 2: "and those persons in active concert or participation with any of them who receive actual notice of this Order"

Line 4: "using" and "or otherwise using."

The proposed injunction will be entered with the foregoing alterations.

## V. Conclusion

Raven's motion for judgment as a matter of law or for new trial (Doc. 374) is DENIED. Raven's motion for judgment of a finding of inequitable conduct (Doc. 376) is DENIED. J&M's motion for permanent injunction (Doc. 372) is GRANTED to the extent stated in this order. The court will enter a separate order of injunction. The clerk is hereby directed to enter judgment accordingly. IT IS SO ORDERED this 6th day of December, 2021.

s/ John W. Broomes
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE